COLLINS *v.* GERHARDT.

1. NAVIGABLE WATERS—COMMON-LAW TEST OF NAVIGABILITY.
   Although at common law only the sea and those rivers in which the tide ebbed and flowed were legally navigable, yet rivers above the ebb and flow of the tide capable of carrying commerce were characterized as navigable in fact.

2. SAME—WATERS NAVIGABLE IN FACT ARE NAVIGABLE IN LAW.
   Since Michigan has no waters in which the tide ebbs and flows, the test applied to determine whether her lakes and rivers are legally navigable is the test applied by the common law to determine whether they are navigable in fact, and if so, they are navigable in law.

¹Navigable Waters, 29 Cyc. p. 291, 27 R. C. L. 1299, 3 R. C. L. Supp. 1549; ²Id., 29 Cyc. p. 291.

3. SAME—STREAMS CAPABLE OF FLOATING LOGS ARE NAVIGABLE.

Under an enlargement of the common-law rule, applied by the courts in the early history of the State, all streams which in their natural state were capable of floating logs and rafts became legally navigable and public.

4. SAME—STREAM USED IN PAST FOR FLOATING LOGS IS NAVIGABLE.

A river which in the past had been used to float logs and other timber to saw mills, and which in its natural state is still potentially capable of use for floatage purposes, is a navigable stream.

5. SAME—NAVIGABLE CHARACTER NOT LOST BY NONUSER.

The navigable character of a stream is not lost by nonuser for any particular purpose, since it is its capacity for public uses and not the frequency with which it is used that determines its navigability.

6. SAME—RIPARIAN PROPRIETOR OWNS LAND TO THREAD OF NAVIGABLE STREAM.

A riparian proprietor owns the' land to the thread or center of a navigable river, and if he owns the land on both sides he owns the entire soil under the water.

7. SAME—RIPARIAN PROPRIETOR DOES NOT OWN WATER OR FISH.

Although a riparian proprietor owns the soil under the water, he does not own the water, nor does he own the fish, but so far as they are capable of ownership they belong to the State for the common benefit of the people.

8. SAME—TITLE OF RIPARIAN OWNER IS SUBJECT TO TRUST SECURING TO PEOPLE RIGHTS OF NAVIGATION, FISHING AND FOWLING.

Since both the United States and the State of Michigan held the waters of navigable rivers and lakes and the soil under them in trust for the people, a trust of which neither could divest itself, one acquiring title to the bed of a navigable stream holds it subject to a perpetual trust to secure to the people their rights of navigation, fishing, and fowling.

9. FISH—ONE FISHING IN NAVIGABLE STREAM NOT A TRESPASSER UNLESS HE GOES UPON THE UPLAND.

One fishing in the waters of a navigable stream is not guilty of trespass if he gain access thereto without going upon the uplands of the riparian owners.

---

[a]Logs and Logging, 38 C. J. § 116, 41 L. R. A. 373, 42 L. R. A. 326, 27 R. C. L. 1304, 3 R. C. L. Supp. 1515, 5 R. C. L. Supp. 1501; [4]Navigable Waters, 29 Cyc. p. 292; [5]Id., 29 Cyc. p. 292; [6]Id., 29 Cyc. p. 356, 23 A. L. R. 757; [7]Id., 29 Cyc. p. 356; [8]Id., 29 Cyc. p. 356; [9]Fish, 26 C. J. § 17.

10. SAME—RIGHT OF FISHING IN NAVIGABLE WATERS IS INHERENT IN THE PUBLIC.

The right of fishing in navigable waters when and where it may be done without trespassing the fast land of riparian owners is a public one inhering in the people of the State and subject only to such restraints as the State may impose.

11. SAME—NAVIGABILITY OF WATERS FIXES CHARACTER AS PUBLIC IN WHICH PEOPLE HAVE INHERENT RIGHT OF FISHING.

Although it cannot be said that fishing is an incident of navigation, yet the navigability of a stream or lake fixes its character as public water, in which the people of the State have an inherent right of fishing.

12. NAVIGABLE WATERS—RIGHTS OF RIPARIAN OWNERS ARISE FROM SHORE OWNERSHIP.

The rights of riparian owners do not arise from ownership of the fee of the bed of the stream, but from shore ownership.

13. SAME—TITLE OF FEDERAL GOVERNMENT IN SUBAQUEOUS LANDS PASSED TO STATE BURDENED WITH SAME TRUST ATTACHED IN HANDS OF FEDERAL GOVERNMENT.

The title of the Federal government to the fast lands, which it held as proprietor, did not pass to the State except by special grant, but the title which the Federal government held as sovereign, as trustee, in the subaqueous lands covered by navigable waters, did pass to the State upon its admission into the Union, not as proprietor but as sovereign, as trustee and burdened with the same trust attached to it in the hands of the Federal government.

14. CONSTITUTIONAL LAW—ONE ACCEPTING BENEFITS UNDER STATUTE MAY NOT CONTEST VALIDITY OF CONDITIONS ATTACHED.

A riparian owner who has accepted the benefits of stocking a navigable stream with fish furnished by the State under the provisions of Act No. 121, Pub. Acts 1891 (2 Comp. Laws 1915, §§ 7694-7697), may not contest the validity of the conditions attached by the State to such acceptance.

BIRD, C. J., and STEERE and WIEST, JJ., dissenting.

Error to Lake; Lamb (Fred S.), J., presiding. Sub-

---

[10]Fish, 26 C. J. § 19 (Anno); [11]Id., 26 C. J. § 17; [12]Navigable Waters, 29 Cyc. pp. 333, 334; [13]Id., 29 Cyc. p. 356 (Anno); [14]Constitutional Law, 12 C. J. § 190.

mitted April 9, 1926.    (Docket No. 66.)    Decided
December 8, 1926.

Case by Frank Collins against Gideon Gerhardt for
trespass.    Judgment for plaintiff *non obstante vere-
dicto*.    Defendant brings error.    Reversed, and judg-
ment ordered entered for defendant.

*Linsey, Shivel & Smedley* (*Robert B. Savidge,
Roberts P. Hudson, Harry D. Jewell, William K. Clute,
Charles V. Hilding,* and *Leland D. Phelps,* of counsel),
for appellant.

*Wilbur B. Pool, A. W. Penny,* and *Brown, Hahn &
Sanger* (*George P. Hahn,* of counsel), for appellee.

*Andrew B. Dougherty,* Attorney General, *Carl D.
Mosier,* Assistant Attorney General, *Willis B. Perkins,
Jr., John M. Dunham,* and *George E. Pardee, amicus
curiæ.*

McDONALD, J.    The plaintiff, a resident of Toledo,
Ohio, owns 120 acres of land on both sides of the Pine
river in Dover township, Lake county, Michigan.    This
river is a well known trout stream.    It has been
stocked by the State.    The plaintiff claims the ex-
clusive right of fishery in that part of the stream
which flows through his land.    Accordingly, at the
point where it enters his premises he has strung three
strands of barbed wire across from shore to shore and
has posted notices warning the public to keep out.
On the 21st of May, 1925, the defendant was fishing
in Pine river.    Disregarding the warning notices, he
climbed over the wire fence and waded the river,
angling as he went.    The plaintiff sued him in justice's
court for trespass.    From a verdict and judgment
for the defendant, the plaintiff appealed to the circuit
court.    Again the defendant had a verdict, but on

motion the circuit judge entered a judgment for the plaintiff for nominal damages notwithstanding the verdict. The defendant brings error to this court.

The question involves a determination of the relative fishing rights of the public and riparian owners in the navigable rivers of this State. In a very able opinion the circuit judge who heard the case reasons to the conclusion that the public has no right to fish in the Pine river where it flows through the plaintiff's land. He bases this conclusion, *first,* on a finding that it is not a navigable river, and *second,* that though it be navigable the plaintiff has the exclusive right of fishery because he owns the soil under the water. It is conceded by all parties that if this river is not navigable Mr. Collins has the exclusive right of fishing in that portion which flows over his land. So that logically the first question to be considered is whether Pine river is a navigable stream.

In view of modern social and economic conditions, and the flexibility of the common law in adapting itself to the changing needs of the people, we shall not consider the term navigability in a too technical commercial sense, or seek out some ancient test in determining if Pine river belongs in the class legally regarded as public waters. It has been said that:

"The right of the public use in American rivers and streams depends, not upon their navigability, in the technical sense of the term, as defined by the common law." *Carter* v. *Thurston,* 58 N. H. 104 (42 Am. Rep. 584).

And:

"If under present conditions of society, bodies of water are used for public uses other than mere commercial navigation, in its ordinary sense, we fail to see why they ought not to be held to be public waters, or navigable waters, if the old nomenclature is preferred." *Lamprey* v. *State,* 52 Minn. 181, 199 (53 N. W. 1139, 18 L. R. A. 670, 38 Am. St. Rep. 541).

The common law relative to the navigability of waters has never been wholly adopted by the courts of this State. As has been said, it is not adaptable to our conditions and circumstances. If it had been adopted neither our Great Lakes nor our largest rivers could be classed as navigable. At common law only the sea and those rivers in which the tide ebbed and flowed were navigable. But above the ebb and flow of the tide some rivers were capable of floating vessels and were valuable in carrying the trade and commerce of the country. These rivers were not legally navigable but were characterized as navigable in fact. In Michigan we have no waters in which the tide ebbs and flows, but we have lakes and rivers which would meet the test applied by the common law to waters navigable in fact. The test which the common law applied to determine whether rivers were navigable in fact was originally used in this country to determine if they were navigable in law. Here, every stream that is navigable in fact is navigable in law. So our first understanding of what constituted navigability in a river was whether it had the capacity for carrying boats and accommodating commerce and travel. But, in the settlement and development of this State, it soon became apparent that the people had other uses for the rivers and streams. There came the lumber industry and a demand for the use of the rivers for the floatage of logs and rafts. The demand was resisted by the riparian proprietors, who claimed that the only use the public could make of the rivers and streams was in navigation by boats. This court met the situation by declaring all rivers navigable and public which in their natural state were capable of floating logs, boats and rafts. *Moore* v. *Sanborne,* 2 Mich. 519 (59 Am. Dec. 209).

In that case the court said:

"It was contended in argument, in behalf of the plaintiff in error, that the capacity of a stream to float logs and rafts, was no criterion of the public right of servitude; but that to render a river a public highway, it must be susceptible of navigation by boats. But this, we apprehend, is too narrow a rule upon which, in this country, to establish the rights of the public, and as already intimated, such is not the rule in any of the States.    The servitude of the public interest depends rather upon the purpose for which the public requires the use of its streams, than upon any particular mode of use."

Thus, it appears that early in the history of the State the common-law rule relative to the navigability of rivers was enlarged to embrace all streams having a capacity to float logs and rafts; and this was done to meet the needs and necessities of the people.  *Moore* v. *Sanborne, supra,* was decided in 1853.    During the long period that has followed it is not surprising to find in the judicial opinions of the court expressions of *dicta* from eminent common-law jurists, questioning the soundness of the principles enunciated in that case.    But the *Sanborne Case* has never been overruled.    There is no reason why it should be.    It is in harmony with the judicial decisions of other States where similar conditions exist.    It lays down a sensible rule based on the necessities of the people and saves for them all of the valuable public uses of which their rivers are capable.

Justice Cooley recognized this rule in his great work on Constitutional Limitations, and states it as follows:

"If a stream is of sufficient capacity for the floatage of rafts and logs in the condition in which it generally appears by nature, it will be regarded as public, notwithstanding there may be times when it becomes too dry and shallow for that purpose." Cooley's Constitutional Limitations (7th Ed.), p. 861.

Measured by this test, is Pine river navigable?

In his findings of fact, which are amply supported by the evidence, the circuit judge said:

"This river, from the time of the earliest timber operations along its banks until the time when the forest products tributary thereto have been manufactured and marketed, had been used to float pine logs and other timber to saw mills and to market down the stream. * * * This river in its natural state is still potentially capable for use for floatage purposes."

In view of these facts as to its capacity for public use, Pine river is a navigable stream. Its character as such has not been changed, and has not been lost by nonuser for any particular purpose. It is still "potentially capable for use for floatage purposes." It is the capacity of a stream for public uses and not the frequency with which it is used that determines its navigability. *Moore* v. *Sanborne, supra.*

The next question presented for our consideration is the plaintiff's claim that, though Pine river be a navigable stream, he has the exclusive right of fishing in that portion which flows over his land, because he owns the soil under the water. Under the law of this State a riparian proprietor owns the land to the thread or center of navigable rivers. If he owns the land on both sides he owns the entire soil under the water. Mr. Collins owns the soil under the water of Pine river where it flows over his land. But he does not own the water, and he does not own the fish. So far as they are capable of ownership they belong to the State for the common benefit of the people. This is conceded by the plaintiff, but he bases his exclusive right to fish in the water over his land on the common-law doctrine that the right of fishery follows the ownership of the soil. The determination of this question involves an inquiry into the character of his title or ownership. Is it absolute or qualified? It will be helpful to recall that Michigan was carved out

of the Northwest Territory; that the Territory was ceded to the United States by Virginia; that the United States held this Territory in trust for future States to be created out of it; that the United States held the waters of navigable rivers and lakes and the soil under them in trust for the people, just as the British crown had formerly held them in trust for the public uses of navigation and fishery; that when Michigan entered the union of States she became vested with the same qualified title that the United States had; that these waters and the soil under them passed to the State in its sovereign capacity impressed with a perpetual trust to secure to the people their rights of navigation, fishing and fowling.

In the very recent case of *Nedtweg* v. *Wallace, ante,* 14, this court said:

"The State of Michigan, upon admission to the Union, became vested with title to the beds of all the navigable waters, like unto the crown of England or the crown and parliament at common law. This State is committed to the common-law doctrine that riparian rights extend to the thread of rivers and into lakes, except the Great Lakes. It is necessary to go back to the common law to decide the claim that the title of the State is impressed with a perpetual trust under which rights of navigation, fishing and fowling must be saved to the public."

The State of Illinois was also created out of the Northwest Territory. Referring to the title of the navigable waters with which it became vested, the United States Supreme Court said in *Illinois Cent. R. Co.* v. *Illinois,* 146 U. S. 387, 452 (13 Sup. Ct. 110):

"It is a title held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties."

Also in Wisconsin the Supreme Court said:

"So we are safe in saying that the title to the beds of all navigable streams of this State passed to the State from the United States with all the incidents of public waters at common law, including the right of fishing as well as navigation." *Willow River Club* v. *Wade,* 100 Wis. 86, 111 (76 N. W. 273, 42 L. R. A. 305).

Now, it being the fact that the State of Michigan acquired title to all of the beds of its navigable waters in perpetual trust for the preservation of the public right of navigation, fishing, etc., and Pine river being navigable, how has it come about that the plaintiff, as riparian owner, has secured a title unimpressed with this trust? The answer is that he has no such title. If he has derived his title by purchase and grant from the State, he has taken it subject to the same trust with which it was impressed while vested in the State. If he derived it by patent from the United States, he took it subject to a like trust. Neither the United States nor the State of Michigan could divest itself of this trust. As was said in *Nedtweg* v. *Wallace, supra:*

"There has arisen, out of centuries of effort, limitation of crown prerogative, parliamentary action, numerous adjudications, common necessity, and public forethought, a rule beyond question, impressing rights of the public upon all navigable waters. * * * The State may not, by grant, surrender such public rights any more than it can abdicate the police power or other essential power of government."

It is not necessary to cite other authorities to show that this trust cannot be abrogated or surrendered. Our own court has so held.

While the United States held title to the Northwest Territory its policy was to leave the matter of fixing the rights of riparian owners to the future States. For 23 years after its admission to Statehood, Michigan adhered to the policy of retaining title to the beds of its Great Lakes and navigable rivers, and it

has never by grant or legislative enactment changed that policy.    It still owns the soil under the waters of the Great Lakes, but, by judicial decision in 1860, the title to the beds of navigable rivers was declared to be in the riparian owners.    It was then that Justice CAMPBELL wrote *Lorman* v. *Benson,* 8 Mich. 18 (77 Am. Dec. 435).    He seems to have considered it the wiser policy to place the title of the soil under navigable rivers in the riparian proprietors.    This policy from long acquiescence has become a rule of property, so that it is now settled in this State that a conveyance of land adjoining a navigable river carries title to the center of the stream.    But, though the court declared the title to be in the riparian owner, it could not divest the State of its trustee capacity, and did not undertake to do so.    The title allowed to be taken by the riparian owners was subordinate to the public rights, including the public right of fishing. It was so held in *McMorran Milling Co.* v. *C. H. Little Co.,* 201 Mich. 301, where it was said:

"It is true that the State might either by legislative enactment or judicial decision as has been done in this State, retain title to the bed of the Great Lakes and surrender such title in the riparian owner upon streams; but such title in the hands of either the State or riparian owner was still burdened with the trust."

From this it follows that the common-law doctrine, viz., that the right of fishing in navigable waters follows the ownership of the soil, does not prevail in this State.    It is immaterial who owns the soil in our navigable rivers.    The trust remains.    From the beginning the title was impressed with this trust for the preservation of the public right of fishing and other public rights, which all citizens enjoyed in tidal waters under the common law.

Pine river is navigable.    In its waters the people have the common right of fishing.    The plaintiff, though owner of the soil, has no greater fishing rights

than any other citizen.     Their rights are equal and correlative.     So long as water flows and fish swim in Pine river, the people may fish at their pleasure in any part of the stream subject only to the restraints and regulations imposed by the State.     In this right they are protected by a *high, solemn* and *perpetual* trust, which it is the duty of the State to forever maintain.     Of course, in exercising this right people cannot go upon the uplands of riparian owners in order to gain access to the water.     If they do that they are guilty of trespass.

Upon the trial of this cause it was further urged in defense of the people's right to fish in Pine river, that this right was secured to them by Act No. 121, Pub. Acts 1891 (2 Comp. Laws 1915, §§ 7694, 7695). The plaintiff successfully attacked this act as unconstitutional.     We have not discussed that question because the provisions of the act are merely declaratory of rights which the people already possessed under the laws of this State, and it is therefore of no importance.

The defendant, Gideon Gerhardt, was not guilty of trespass as charged by the plaintiff in this case.     He was fishing where he had a legal right to fish, and in getting into the water he did not go upon the plaintiff's upland.

The issues here involved were submitted to the jury. Their verdict was for the defendant.     On motion of counsel for the plaintiff the court entered a judgment for him notwithstanding the verdict.     In this the court erred.

The judgment so entered is reversed, and the cause remanded to the circuit court where a judgment will be entered for the defendant in accordance with the verdict of the jury.     The defendant will have costs.

SHARPE, SNOW, FELLOWS, and CLARK, JJ., concurred with MCDONALD, J.

237—Mich.—4.

FELLOWS, J. (*concurring.*)     I am fully in accord with the opinion of Mr. Justice MCDONALD in this case. But for the importance of the case both to public and private interests, and the fact that an exhaustive opinion in dissent has been prepared, I should content myself with signing that opinion.     My views on the subject here involved are, however, pronounced, and I desire to deal with certain phases of it at some length.     I shall not take time or space in discussing the question of whether Pine River is a navigable stream.     That question was submitted to the jury in a charge not complained of, which correctly gave the rule in force in this State.     The jury found it was a navigable stream and there was an abundance of testimony taking that question to the jury.

It will be noted, I think, that while the courts in general uphold the right of the public to fish in navigable waters when and where it may be done without trespassing the fast land of riparian owners, and subject to such regulation as may be imposed by the State, the courts of different States do not always indulge in a uniform line of reasoning in reaching that result.     The basis of reasoning is not of so much importance as is the fact that the courts generally recognize that the right is a public one inhering in the people of the State and subject only to such restraints as the State may impose.

I do not think it can be said that fishing is an incident of navigation.     The navigability of a stream or lake, however, fixes its public character, that of public water, and the right of fishing in public waters is a public right belonging to the people of the State. The language of the Supreme Court of Arkansas in *State, ex rel. Thompson,* v. *Parker,* 132 Ark. 316, 324 (200 S. W. 1014), is here applicable.     It was there said:

"The common right of hunting and fishing in such navigable waters is not reserved to the public as a

right attached and incident to the right of navigation, but it is one that inheres in the public in our State because the State, in trust for the public, is the owner of the soil in navigable waters to high-water mark, and the common right of hunting and fishing is incident to such ownership, as well as the other common right of navigation.    In our State these are independent rights, and both alike belong to the class of common rights which King John essayed to hold as private and individual, exclusive of the public, but which the barons wrested from him, and which were vested by the *Magna Charta* in the crown (the State) for the benefit of the public.    These rights have come down to us from the common law and are reserved under our 'Great Charter' to the States respectively to be held in trust for the benefit of the people."

That the rights of riparian owners do not arise from ownership of the fee of the bed of the stream but from shore ownership was settled by the highest court of the Nation in *United States* v. *Chandler-Dunbar Water Power Co.,* 229 U. S. 53, 70 (33 Sup. Ct. 667), where it was said:

"Nor need we consider cases cited which deal with the rights of riparian owners under State laws and private or public charters conferring rights.    That riparian owners upon public navigable rivers have in addition to the rights common to the public certain rights to the use and enjoyment of the stream which are incident to such ownership of the bank, must be conceded.    *These additional rights are not dependent upon title to the soil over which the river flows, but are incident to ownership upon the bank.*"

Before taking up our own cases I shall consider some of the decisions from other States.    In England the navigability of a stream was determined by the ebb and flow of the tide and some of the States on the seaboard early followed this classification.    This State in consonance with our necessities early disregarded such an artificial rule and held that waters navigable in fact are navigable in law.    But whether

the States recognize the ebb and flow of the tide as the test of navigability or the rule adopted by this and other inland States, the holding is quite uniform, that the right inheres in the public to fish in streams, lakes, and ponds which are navigable in law.     In *Bickel* v. *Polk*, 5 Harr. (Del.) 325, it was said:

"The right of fishing in all public streams where the tide ebbs and flows, is a common right, and the owner of land adjoining tide water, though his title runs to low water mark, has not an exclusive right of fishing; the public have the right to take fish below high water mark, though upon soil belonging to the individual, and would not be trespassers in so doing; but if they take the fish above high water mark, or carry them above high water mark and land them on private property, this would be a trespass; but the damages would be merely nominal, as for an illegal entry; it being agreed in the argument that there was no other injury.     In all navigable rivers, where the tide ebbs and flows, the people have of common right the privilege of fishing, and of navigation, between high and low water mark; though it be over private soil."

In *Pacific Steam Whaling Co.* v. *Packers Ass'n*, 138 Cal. 632, 636 (72 Pac. 161), the Supreme Court of California said:

"The right of fishery in the waters of the ocean, whether in the open sea or where the waters ebb and flow over tidelands, is a public right which may be exercised by any citizen (*Shively* v. *Bowlby*, 152 U. S. 1 [14 Sup. Ct. 548], and cases there cited; *Hardin* v. *Jordan*, 140 U. S. 371 [11 Sup. Ct. 808, 838]; *Mann* v. *Tacoma Land Co.*, 153 U. S. 273 [14 Sup. Ct. 820]). In its very nature the exercise of the right of fishing in the public waters of the ocean is not, and can not be, exclusive; its exercise, no matter by whom or for what length of time, is only the exercise of a public right.     There can be no possession for the purpose of fishery of an area of land covered by the waters of the ocean that is at all analogous to an actual possession of a tract of upland which might give the possessor a right of action against a mere trespasser;

one who exercises this public right of fishery in the sea does not by that act make himself a trespasser."

In *Bell* v. *Smith,* 171 N. C. 116 (87 S. E. 987), Chief Justice Clark, speaking for the court, said:

"The defendants, admittedly, have not trespassed upon the shore or beach owned by the plaintiff. It follows that in the navigable waters opposite plaintiff's beach she has no exclusive right of fishing, though such spot is within the bounds of her grant.

"The right to fish in navigable waters is open to all, and the proprietorship of the adjacent beach gives no exclusive right of fishing in the navigable waters in front thereof; nor does the fact that the plaintiff as owner of the adjacent beach has been in the habit of drawing a seine up to her beach at that point give her such exclusive fishery, no matter for how many years she has exercised or enjoyed such privilege."

In *Anderson* v. *Columbia Contract Co.,* 94 Or. 171, 182 (184 Pac. 240, 185 Pac. 231, 7 A. L. R. 653), the court had before it both the rights of navigation and fishing and while the court recognized the right of navigation as of more importance than fishing rights, both were recognized as rights inherent in the public. It was there said:

"The Columbia river is a navigable stream and as such is a common highway 'and forever free.' This right is a public one and it is not only given by the common law but is preserved by the statute admitting the State of Oregon into the Union: *Johnson* v. *Jeldness,* 85 Or. 657, 661 (167 Pac. 798, L. R. A. 1918A, 1074). The right of fishery is likewise a common right. The right of navigation is paramount, for the reason that it is of the most importance to the public weal."

In *Peck* v. *Lockwood,* 5 Day (Conn.), 22, 28, after considering some of the authorities, it was said:

"The foregoing authorities abundantly prove the general proposition, that the right of fishing on the soil of another when overflowed with the tide from the sea, or arm of the sea, is a common right. The

only doubt that can arise, in cases of this kind, is, whether there is a common right of fishing for shellfish, after the reflux of the tide?

"Although this right is nowhere denied by any authority, and as the principle is certainly included in the general proposition, that on such lands the right of fishing is common to every subject; yet, I think, some reasonable doubt might have been entertained on this subject, if no further authority could have been produced.    The case of *Bagott* v. *Orr*, 2 Bos. & Pul. 472, is, I apprehend, a case in point.    It was the very case of entering upon land of the plaintiff, and taking shell-fish, by digging up the earth betwixt high and low water mark; which could be done only after the reflux of the sea.    This case was determined in favor of the defendant, on the ground that such fishery, in such a place, which is the very case before the court, was a matter of common right.    The court, in delivering their opinion, say, that if the plaintiff had it in his power to abridge the common-law right of the subject to take sea-fish (meaning in that case shell-fish, for that was the case before the court), he should have replied that matter specially; and, that not having done so, the defendant must succeed upon his plea for taking the fish."

And in *Sollers* v. *Sollers*, 77 Md. 148 (26 Atl. 188, 20 L. R. A. 94, 39 Am. St. Rep. 404), the court of appeals of Maryland held that one was not a trespasser who caught fish in navigable waters although they had previously been reduced to possession and confined by a wire fence across the mouth of the cove in which they were later caught.    See, also, *Hooker* v. *Cummings*, 20 Johns. (N. Y.) 90 (11 Am. Dec. 249); *Columbia Canning Co.* v. *Hampton*, 161 Fed. 60; *Hess* v. *Muir*, 65 Md. 586 (5 Atl. 540, 6 Atl. 673); *Ex parte Bailey*, 115 Cal. 472 (101 Pac. 441, 31 L. R. A. [N. S.] 534, 132 Am. St. Rep. 95); *Matthews* v. *Treat*, 75 Me. 594; *Church* v. *Meeker*, 34 Conn. 421; *Stevens* v. *Railroad Co.*, 34 N. J. Law, 532 (3 Am. Rep. 269); *Sherwood* v. *Stephens*, 13 Idaho, 399 (90 Pac. 345).

That the title to the lands in the public domain, subaqueous as well as fast land, was originally in the Federal government all will concede. That such title to the fast lands was that of a proprietor will likewise be conceded. That the title of the Federal government to the subaqueous lands over which navigable waters flowed was of a different character than that by which it held the fast lands, I hope to be able to demonstrate. This leads to the consideration of the so-called trust doctrine. The title of the Federal government to the fast lands, which it held as proprietor, did not pass to the State except by special grant. But the title which the Federal government held in the subaqueous lands covered by navigable waters, which it held as sovereign, as trustee, did pass to the State upon its admission into the Union of States, not as a proprietor but as sovereign, as trustee, and burdened with the same trust attached to it in the hands of the Federal government. That the Federal government in its sovereign capacity could for navigation purposes retake and appropriate such navigable waters and the subaqueous lands underlying them without condemnation and without compensation has been settled by the court of last resort of the Nation in numerous cases, notably *United States* v. *Chandler-Dunbar Water Power Co.*, 229 U. S. 53 (33 Sup. Ct. 667), but that it could not as proprietor convey them to private individuals to the detriment of the State's title as sovereign was likewise settled by that court many years ago in *Pollard's Lessee* v. *Hagan,* 3 How. (U. S.) 212, 230, where it was said:

"This right of eminent domain over the shores and soils under the navigable waters, for all municipal purposes, belongs exclusively to the States within their respective territorial jurisdictions, and they, and they only, have the constitutional power to exercise it. To give to the United States the right to transfer to a citizen the title to the shores and the soils under the

navigable waters, would be placing in their hands a weapon which might be wielded greatly to the injury of State sovereignty, and deprive the States of the power to exercise a numerous and important class of police powers."

The State holding these subaqueous lands in its sovereign capacity (some cases say both as sovereign and proprietor) holds them as trustee for the public and for its use and benefit. If we should borrow the general trust relations and apply them, the Federal government is a *cestui que trust,* and if the needs of commerce, of navigation require the appropriation of such lands for the purposes of navigation, the Federal government as such *cestui que trust* may enforce its rights to them. The people of the State are likewise *cestuis que trustent* for their public use and among such public uses is their use for fishing; the right to fish in them is a right such *cestuis que trustent* have in them and may enjoy in common. The State may surrender the technical fee title to such lands but it can not unshackle them from the trust which continues no matter where the technical fee title may rest. Most of the States retain the technical fee title in themselves. This State has never by legislative action surrendered such title, but by judicial polity which has established a rule of property, this court in numerous decisions has held that the riparian owner takes title to the thread of the stream. But, as I have pointed out, such title is burdened with the trust, and, as I shall presently show, this court has expressly recognized such trust and unequivocally adopted the trust doctrine. However, I shall defer consideration of our own holdings until those of other jurisdictions have been examined.

Mr. Justice Bradley, speaking for the court in *Hardin* v. *Jordan,* 140 U. S. 371, 381 (11 Sup. Ct. 808, 838), said:

"With regard to grants of the government for lands bordering on tide water, it has been distinctly settled that they only extend to high-water mark, and that the title to the shore and lands under water in front of lands so granted enures to the State within which they are situated, if a State has been organized and established there.   Such title to the shore and lands under water is regarded as incidental to the sovereignty of the State—a portion of the royalties belonging thereto and held in trust for the public purposes of navigation and fishery—and cannot be retained or granted out to the individuals by the United States."

And sitting at circuit in *Stockton* v. *Railroad Co.,* 32 Fed. 9, 19, the same Justice said:

"The information rightly states that, prior to the Revolution, the shore and lands under water of the navigable streams and waters of the province of New Jersey belonged to the king of Great Britain as part of the *jura regalia* of the crown, and devolved to the State by right of conquest.   The information does not state, however, what is equally true, that, after the conquest, the said lands were held by the State, as they were by the king, *in trust* for the public uses of navigation and fishery, and the erection thereon of wharves, piers, light-houses, beacons, and other facilities of navigation and commerce.   Being subject to this trust, they were *publici juris;* in other words, they were held for the use of the people at large."

And in *Smith* v. *Maryland,* 18 How. (U. S.) 71, 74, it was said by Mr. Justice Curtis, speaking for the court:

"But this soil is held by the State, not only subject to, but in some sense in trust for, the enjoyment of certain public rights, among which is the common liberty of taking fish, as well shellfish as floating fish."

In *Illinois Cent. R. Co.* v. *City of Chicago,* 173 Ill. 471, 485 (50 N. E. 1104, 53 L. R. A. 408), it was said:

"It is true that the State holds the title to the lands covered by the waters of Lake Michigan lying within its boundaries, but it holds the title in trust for the

people, for the purposes of navigation and fishery. The State has no power to barter and sell the lands as the United States sells its public lands, but the State holds the title in trust, in its sovereign capacity, for the people of the entire State, as held in *People* v. *Kirk*, 162 Ill. 138 (45 N. E. 830, 53 Am. St. Rep. 277)."

In *Brickell* v. *Trammell*, 77 Fla. 544, 559 (82 South. 221), it was said:

"The trust in which the title to the lands under navigable waters is held is governmental in its nature and cannot be wholly alienated by the States. For the purpose of enhancing the rights and interests of the whole people, the States may by appropriate means grant to individuals limited privileges in the lands under navigable waters, but not so as to divert them or the waters thereon from their proper uses for the public welfare, or so as to relieve the States respectively of the control and regulation of the uses afforded by the land and the waters, or so as to interfere with the lawful authority of congress."

The Maine court thus states the rule in *State* v. *Leavitt*, 105 Me. 76, 78 (72 Atl. 875, 26 L. R. A. [N. S.] 799):

"The shores of the sea and navigable rivers within the flux and reflux of the tide, by the common law belonged *prima facie* to the King. Holding the soil thus, the King held the appurtenant right of fishery, in trust for the benefit of his subjects. *Moulton* v. *Libbey*, 37 Me. 472 (59 Am. Dec. 57); *Commonwealth* v. *Hilton*, 174 Mass. 29 (54 N. E. 362, 45 L. R. A. 475). And after *Magna Charta*, he could not, by an exercise of his prerogative, exclude the public from the right of fishery, or grant an exclusive right to a private individual, either together with or distinct from the soil. Hale, De Jure Maris, chap. 5. The grantee of the King took the soil subject to the trust. Hence the right of taking fish where the tide ebbs and flows was common to all the people."

In *Commonwealth* v. *Hilton*, 174 Mass. 29, 31 (54 N. E. 362, 45 L. R. A. 475), it was said:

"By the common law of England all the King's subjects had a common right of fishery in the sea and in all bays, coves, and arms of the sea where the tide ebbs and flows.   The King, who holds the right of soil under tide water, holds the appurtenant right of fishery in trust for his subjects, and since *Magna Charta* he can not by grant deprive them of it.   These rights in America were granted in the colonial charters to be held for the benefit of the inhabitants, and when the colonies achieved their independence they remained in the several States, to be exercised for the common good.   *Dill* v. *Wareham*, 7 Metc. (Mass.) 438, 446; *Commonwealth* v. *Alger*, 7 Cush. (Mass.) 53, 82; *Weston* v. *Sampson*, 8 Cush. (Mass.) 347 (54 Am. Dec. 764) ; *Martin* v. *Waddell*, 16 Pet. (U. S.) 367, 410, 432; *Pollard's Lessee* v. *Hagan*, 3 How. (U. S.) 212; *Smith* v. *Maryland*, 18 How. (U. S.) 71; *Manchester* v. *Massachusetts*, 139 U. S. 240 (10 Sup. Ct. 559) ; *Arnold* v. *Mundy*, 1 Halst. (N. J. Law) 1 (10 Am. Dec. 356).

"The rights of the States in the management and regulation of these fisheries is not limited like that of the crown in England.   The States hold them in trust for the public; but they exercise not only the rights of sovereignty, except in those matters over which it is granted to the general government, but also the right of property as to everything which remains in common for all the people."

The opinion in *Morris* v. *United States*, 174 U. S. 196, 226 (19 Sup. Ct. 649), is an exhaustive one. Upon this subject it was there said:

"Briefly expressed, the appellants' contention is that the property in the soil under the river Potomac passed to Lord Baltimore and his grantees, and that it passed, not as one of the regalia of the crown, or as a concomitant of government, but as an absolute proprietary interest, subject to every lawful public use, but not the less, on that account, a hereditament, and the subject of lawful ownership, and of the right of full and unqualified possession when that public use shall have ceased.

"We need not enter into a discussion of this proposition, because the doctrine on which it is based has

been heretofore adversely decided by this court in several leading and well-considered cases. *Martin* v. *Waddell,* 16 Pet. (U. S.) 367; *Den* v. *Jersey Company,* 15 How. (U. S.) 426; *Shively* v. *Bowlby,* 152 U. S. 1 (14 Sup. Ct. 548).

"The conclusions reached were that the various charters granted by different monarchs of the Stuart dynasty for large tracts of territory on the Atlantic coast conveyed to the grantees both the territory described and the powers of government, including the property and the dominion of lands under tide waters; that by those charters the dominion and propriety in the navigable waters, and in the soils under them, passed as part of the prerogative rights annexed to the political powers conferred on the patentee, and in his hands were intended to be a trust for the common use of the new community about to be established, as a public trust for the benefit of the whole community, to be freely used by all for navigation and fishery, and not as private property, to be parcelled out and sold for his own individual emolument."

In *State* v. *Welch,* 66 N. H. 178 (28 Atl. 21), it was said:

"Whatever view is taken of the evidence tending to show, as the State claimed, that the club owned the surrounding land, it had no tendency to show that they owned the pond. The bed of the pond was reserved, set apart, and held in trust for the public use. The club could not acquire the title by prescription, or by grant from the king or the executive branch of the provincial or State government."

In *Allen* v. *Allen,* 19 R. I. 114 (32 Atl. 166, 30 L. R. A. 497, 61 Am. St. Rep. 738), it was said:

"The State holds the legal fee of all lands below high water mark as at common law, as has been uniformly and repeatedly decided by this court. *Bailey* v. *Burges,* 11 R. I. 330; *Engs* v. *Peckham,* 11 R. I. 210, 224; *Brown* v. *Goddard,* 13 R. I. 76, 81; *Folsom* v. *Freeborn,* 13 R. I. 200, 204. By the common law of Massachusetts and Maine, based upon or declared by a colonial ordinance, the fee in lands to a certain distance below high water mark was given to the upland

proprietor, and this rule applies to such portions of
our shore as have been ceded from Massachusetts.
This right of the State is held, however, by virtue of
its sovereignty, and in trust for all the inhabitants,
not as a private proprietor.    The public rights se-
cured by this trust are the rights of passage, of naviga-
tion and of fishery, and these rights extend, even in
Massachusetts, to all land below high water mark
unless it has been so used, built upon or occupied, as
to prevent the passage of boats, and the natural ebb
and flow of the tide."

In *State, ex rel. Thompson,* v. *Parker,* 132 Ark. 316,
324 (200 S. W. 1014), after using the language I
have quoted and citing some authorities the court con-
tinued:

"The State can neither alienate these rights nor
abdicate the trust to hold and preserve them for the
untrammeled use of the whole people of the State."

My Brother WIEST calls attention to a note in 23
A. L. R. 765.    The note is an exhaustive one by an
able textwriter.    He does not approve the holdings of
the Wisconsin court on this subject.    On the contrary,
this court does.    In *City of Grand Rapids* v. *Powers,*
89 Mich. 94 (14 L. R. A. 498, 28 Am. St. Rep. 276),
this court said:

\* \* \* "the law of this State is in complete accord
and harmony with that of our sister State of Wiscon-
sin in respect to riparian rights."

And in *State* v. *Venice of America Land Co.,* 160
Mich. 680, this court followed the Wisconsin court and
cited with approval the case of *Illinois Steel Co.* v.
*Bilot,* 109 Wis. 418, 425 (84 N. W. 855, 85 N. W.
402, 83 Am. St. Rep. 905), in which case it was held:

"The title to the beds of all lakes and ponds, and
of rivers navigable in fact as well, up to the line of
ordinary high-water mark, within the boundaries of
the State, became vested in it at the instant of its
admission into the Union, in trust to hold the same
so as to preserve to the people forever the enjoyment

of the waters of such lakes, ponds, and rivers, to the same extent that the public are entitled to enjoy tidal waters at the common law.    A patent from the United States, so far as it purports to cover any of such lands, whether made before the State was admitted into the Union or thereafter, is ineffectual.    It has been so repeatedly held.    A government patent of land bordering on a lake or pond, regardless of the boundaries thereof according to the government survey, does not convey title to the lands below the line of ordinary high-water mark.    The United States never had title, in the Northwest Territory out of which this State was carved, to the beds of lakes, ponds, and navigable rivers, except in trust for public purposes; and its trust in that regard was transferred to the State, and must there continue forever, so far as necessary to the enjoyment thereof by the people of this Commonwealth.    Whatever concession the State may make without violating the essentials of the trust, it has been held, can properly be made to riparian proprietors."

*State* v. *Venice of America Land Co., supra,* committed this court, if it had not been committed before, to the trust doctrine and it likewise committed the court, if it had not been committed before, to the doctrine that the people of the State are *cestuis que trustent* with fishing rights in the navigable waters of the State.    It was there said:

"That the State of Michigan holds these lands in trust for the use and benefit of its people—if we are correct in our conclusion—cannot be doubted.    The State holds the title in trust for the people, for the purposes of navigation, fishing, etc.    It holds the title in its sovereign capacity.    *    *    *
"The trust in the State is an express trust; and the rule is too well settled to need citation of authorities that, as against the State as the trustee of an express trust, the statute of limitations will not run."

But I am persuaded that this court was already committed to the doctrine that the people of the State had the right to fish in the navigable waters of the

State and could exercise such right so long as they did not trespass the fast lands of riparian owners.    In the case of *Lincoln* v. *Davis*, 53 Mich. 375 (51 Am. Rep. 116), it was said in the majority opinion:

"Such fishing as is done with lines from boats, even in narrow streams cannot be complained of by riparian owners.    The fish are like any other animals *feræ naturæ*, and in this region have always been regarded as open to capture by those who have a right to be where they are captured."

It is true that this case was decided by a divided court and it is possible the language used was not necessary to decision, but the case has been cited by this and other courts scores of times.    It is in consonance with other cases in this court, from a few of which I shall now quote:

"The right of navigation is not the only interest that the public, as contradistinguished from the State, has in these waters.    It has also the right to pursue and take fish and wild fowl, which abound in such places." *People* v. *Warner*, 116 Mich. 228.

"To fish is a privilege accorded by the State, and the question of individual enjoyment is one of public privilege, and not of private right." *People* v. *Collison*, 85 Mich. 105.

"The right to fish in navigable waters is a public right.    *    *    *
"To hunt and fish in and upon the navigable waters such as these is a public right of which any citizen may avail himself subject to the game laws of the State." *Ainsworth* v. *Hunting & Fishing Club*, 153 Mich. 185 (17 L. R. A. [N. S.] 1236, 15 Ann. Cas. 706, 126 Am. St. Rep. 474).

"We have often said that the right to fish, like the right to navigate, was a public right, and that it extended to all portions of the lakes." *Stuart* v. *Greanyea*, 154 Mich. 132 (25 L. R. A. [N. S.] 257).

"Lake Gogebic is a navigable lake; it has been stocked with fish which are there found in abundance. There can be no question of plaintiff's right to fish in

its waters." *Douglas* v. *Bergland,* 216 Mich. 380 (20 A. L. R. 197).

I shall not attempt a consideration of all or any considerable number of the cases cited in the briefs. All counsel have been most diligent and painstaking and the briefs filed have been most helpful. A few of our own cases should, however, receive attention. Much reliance is placed by plaintiff's counsel on *Sterling* v. *Jackson,* 69 Mich. 488 (13 Am. St. Rep. 405), in which three most able opinions were filed. But we should not overlook the fact, and it is quite possible that this court has on occasion overlooked the fact, that the *locus in quo* in that case was swamp land granted to the State by the act of September 28, 1850, commonly called the "swamp land act," and under which act the land was surveyed and a patent executed by the United States to the State. The act was a grant *in præsenti,* and the surveying of the land and the issuance of the patent conclusively fixed the character of the lands (*Brown* v. *Parker,* 127 Mich. 390). The fact that by the action of the elements it became overflowed so as to be covered by navigable water did not change its character, which was already conclusively fixed. The State took the title in trust but it was a very different trust from the one now under consideration. The trust under that act was to dispose of the lands and use the proceeds for reclamation purposes. Such trust did not follow the land as the trust here involved does. *Giddings* v. *Rogalewski,* 192 Mich. 319, involved a small pond entirely surrounded by plaintiff's lands, which this court held was nonnavigable and the fast land of plaintiff was trespassed to reach it. In *Winans* v. *Willetts,* 197 Mich. 512, a majority of the court found as a fact that the lake was not navigable and applied the rule applicable to such waters. But in *Beach* v. *Hayner,* 207 Mich. 93 (5 A. L. R. 1052), it was held that one lawfully on

the lake, not having trespassed plaintiff's fast land, did not commit a trespass by rowing over and fishing in the navigable waters over his subaqueous lands.

Entertaining the views I do, I think it unimportant whether Act No. 121, Pub. Acts 1891 (2 Comp. Laws 1915, §§ 7694-7697), is valid or invalid.     But I do not think plaintiff can question its validity.     While plaintiff's caretaker, who had obtained from the State a large number of fish and planted them in the river, claims he did so without plaintiff's authority, another one of plaintiff's employees testified:     "Mr. Collins told me that he had gotten fish from the State and planted them there."     Having had the benefits of the bounty bestowed by the State, he cannot contest the validity of the conditions attached by the State to its acceptance.     *People, for use of Ostapow,* v. *Casualty Co.,* 222 Mich. 296, and authorities there cited.

I agree that the judgment should be reversed with direction to enter judgment on the verdict.

SHARPE, SNOW, CLARK, and MCDONALD, JJ., concurred with FELLOWS, J.

WIEST, J. (*dissenting*).     The learned circuit judge reached the right result and the judgment should be affirmed.     It is true that, in navigable waters, where the soil is not owned by private persons, the right to fowl and fish is in the public.     But to carry the trust theory to the extent of impressing it on private property, by way of implied retention in the sovereign power, overturns rules of property, and disrupts vested titles, too long established by the common law in grants according to its principles and upheld by an almost unbroken line of judicial pronouncements, to admit now of taking the same away without due process of law.

Cases are decided, of course, on particular facts presented, and in *Nedtweg* v. *Wallace, ante,* 14,

we had a case involving the bed of one of the Great Lakes owned by the State, and what we there said about the trust has no application to beds of rivers and inland lakes subject to private ownership.

The right of the public to fish in this stream does not at all turn upon the question of whether it is navigable within the common-law meaning of that term. The cases, ancient and modern, with but few exceptions, are in accord in holding that the right to fish runs with the ownership of the soil.

Much unnecessary confusion has resulted from an imperfect understanding of the true use to be made of the common-law test of navigability, viz., the ebb and flow of the tide. That test only serves in this country in solving the question of ownership of the soil underlying the waters. If ownership of the soil is in the State, the right to there fish is in the public. If ownership of the soil is private, the right to there fish is exclusive of the public. All grants by the government are construed in accordance with the principles of the common law unless they carry a different intention or have origin in another purpose openly expressed. The rule of the common law vested title to lands on tide waters only to high water mark, but above tide waters titles reached to the thread of the stream. Granting right of entry to private property to angle for fish, under the guise of right of navigation or the trust theory, would overturn a rule of property settled in this State from the time of its admission to Statehood.

All questions involved are so interwoven as to bar discussion under specific headings.

This stream may be termed floatable because capable of being used to float logs. *Moore* v. *Sanborne,* 2 Mich. 519 (59 Am. Dec. 209).

In *Grand Rapids Booming Co.* v. *Jarvis,* 30 Mich. 308, it was said of the Grand river:

"This river, so far as it is navigable for vessels, or floatable for logs, is but a public highway by water; the right to navigate the one or float the other is but a right of passage, including only such rights as are incident to *that right* and necessary to render it reasonably available."

A right to fish in a stream, the soil of which is in private ownership, is not an incident of navigation any more than the right of passage over a land highway grants right to stop, reap crops, gather fruit, berries or nuts growing therein. That such acts are forbidden is established by the rule that the public right is an easement and goes no farther than the necessity of use for passage demands.

In *Holyoke Co.* v. *Lyman,* 15 Wall. (U. S.) 500, 512, the Supreme Court of the United States said:

"Ownership of the banks and bed of the stream, as before remarked, gives to the proprietor the exclusive right of fishery, opposite his land.  *  *  *

"Undoubtedly each proprietor of the land adjoining such a river or stream has in that State (Massachusetts) a several or exclusive right of fishery in the river immediately before his land, to the middle of the river, and may prevent all others from participating in it, and will have a right of action against any who shall usurp the exercise of it without his consent."  *  *  *

While no person has property in or any vested interest in any rule of the common law, yet "rights of property which have been created by the common law cannot be taken away without due process."  *  *  *
*Second Employers' Liability Cases,* 223 U. S. 1, 50 (32 Sup. Ct. 169).

The Constitution of this State retains the common law, not repugnant to the Constitution, and except as it has been or may be altered or abrogated by legislation. Schedule, § 1.

The common-law rights of proprietors of the beds of streams and rivers have never been altered by

statute in this State, and are still in full force, and rights thereunder are vested, and can be taken only under due process of law.

In 26 C. J. p. 600, it is stated:

"Although a stream above the ebb and flow of the tide is not navigable in a strict technical sense, yet if it is capable of being navigated by boats, rafts, or logs, the exclusive right of fishery of a riparian owner on its banks is subject to the use of the stream as a public highway for purposes of transportation and commercial intercourse; and on the other hand the right to navigate such stream must be so exercised as not unnecessarily to disturb or interfere with the subordinate private right of fishing."

In *Commonwealth* v. *Chapin*, 5 Pick. (Mass.) 199, 202 (16 Am. Dec. 386), Chief Justice Parker stated:

"The right of passage and of transportation upon rivers not strictly navigable belongs to the public, by the principles of the common law; but the right of fishery remains unrestricted, so that each proprietor of the land adjoining has a several or exclusive right of fishery in the river, immediately before his land, down to the middle of the river, and may prevent all others from participating in it, and will have a right of action against any who shall usurp the exercise of it without his consent."

This rule secures rights so far as the public interest requires and establishes the true line between public and private rights. The law has always recognized the distinction between a mere easement and the right to take a profit. There is no right in the public to fish in a river the bed of which is not *publici juris* but private property. The right to a several fishery here rests upon ownership of the bed of the river. The right of a public fishery necessarily rests either upon title to the bed in or express retention of control by the State.

In *Schulte* v. *Warren*, 218 Ill. 108, 120 (75 N. E. 783, 13 L. R. A. [N. S.] 745), it was said:

"The next question is whether the public have a right to hunt and fish where there is such a right of navigation as an incidenti to the latter right.    Appellant insists that if his lands are subject to a public easement for the purpose of navigation it does not follow that he has lost his exclusive right to hunt and fish over them, while the position of appellees is, that wherever there is a public right of navigation there is also a right to hunt and fish.    There is no natural or necessary connection between the easement of navigation, which is of the same character as a public highway (3 Kent's Com. 427), and the right to hunt and fish where such easement exists.    They are in no manner connected with each other, and the two occupations are not prosecuted by the same individuals with the same vessels or by the same means.    The Supreme Court of Michigan pointed out the difference and the distinction in such rights in the case of *Sterling* v. *Jackson,* 69 Mich. 488 (13 Am. St. Rep. 405).    *    *    *

"The argument that the riparian owner has no property in the particles of water flowing in a stream any more than he has in the air that floats over his land, and that the fish in the stream are not his property any more than the birds that fly over his land, does not tend to sustain the proposition that the public right of fishing is included in or incident of the public right of navigation.    If the argument proves anything it proves too much, since it applies with as much force to waters which are not navigable as to waters which are."

2 Cooley on Torts (3d Ed.), 673, states:

"The right to take fish in the fresh-water streams of the country belongs to the owners of the soil under them, to the exclusion of the public."

Angell on Water Courses (7th Ed.), § 61, states:

"Concomitant with this interest in the soil of the beds of watercourses, is an exclusive right of fishery; so that the riparian proprietor, and he alone, is authorized to take fish from any part of the stream included within his territorial limits."

And in section 65:

"The rule, that the right of fishery, within his territorial limits, belongs exclusively to the riparian owner, extends alike to great and to small streams."

While the public may have in a river an easement or right to float rafts or logs and pass up and down the same in canoes or boats, such right is not inconsistent with an exclusive right of fishing or with the right of the owner's property opposite their respective lands *ad medium filum aquæ*.     *The Queen* v. *Robertson*, 6 Can. Sup. Ct. Rep. 52.

Some authorities divide rivers into three classes: *First,* when they are altogether private such as shallow streams; *second,* when they are private property but subject to the public use; and *third,* when the use and property are in the public.     The property in this river at the point in suit is in plaintiff, the owner of the soil, subject to the public commercial easement of right of passage.     While plaintiff has the exclusive right to fish in that part of the river included in his ground he must so exercise the right as not to injure the other proprietors above or below him on the stream.

In *Beatty* v. *Davis,* 20 Ont. 373, it was held, quoting from the syllabus:

"Ownership of land or water, though not inclosed, gives to the proprietor, under the common law, the sole and exclusive right to fish, fowl, hunt, or shoot within the precincts of that private property, subject to game laws, if any; and this exclusive right is not diminished by the fact that the land may be covered by navigable water.     In such case the public can use the water solely for *bona fide* purposes of navigation, and must not unnecessarily disturb or interfere with the private rights of fishing and shooting."

In that case Chancellor Boyd stated:

"The questions to be dealt with are altogether independent of the frame or policy of the game laws, and fall to be determined upon the common-law rights of the owners of property in respect of fish and wild

creatures fit for food harbouring thereon. The right to take and kill fish and water fowl is one which has attached immemorially to the waters, wastes, or marshes, where they are found. It is variously spoken of in the books as being an incident of territorial right, as being accessory to the ownership of the soil, as arising *ratione soli,* and also (in the case of fish) as being a riparian right. * * *

"The result of the whole is, that the defendants are in the wrong; they came upon the place, not for the purposes of navigation, but to shoot ducks against the protest of the plaintiff. The custom relied upon of persons or of the public going to shoot or fish in that locality year after year does not afford any defense in law against the private rights of the owner. The fact of the place being to some extent navigable water, does not justify any interference with private rights of fishing and fowling."

2 Tiffany on Real Property (2d Ed.), p. 1544, states:

"While the individual members of the public have rights of fishing in waters, the soil below which is the property of the State, except in those cases in which an exclusive right to fish there has been granted by the State legislature or other sovereign authority, they have, as a general rule, no such right in water which covers land belonging to a private individual."

And on page 1545, states:

"Every member of the public has the right of navigation in waters capable of such use, without reference to whether the land beneath the water belongs to the public or to individual owners." * * *

On pages 1547, 1548:

"On principle, moreover, it seems, the fact that the public have a right of navigation over private land should give them no right of hunting, or fishing."

Among other cases in support of the text, Tiffany cites *Sterling* v. *Jackson, supra; Hall* v. *Alford,* 114 Mich. 165 (38 L. R. A. 205). We add *Sewers* v. *Hacklander,* 219 Mich. 143.

Mr. Tiffany also states, p. 1548:

"But there are occasional decisions recognizing such a right;" citing California, Wisconsin, and Ohio decisions.

In *Albright* v. *Cortright*, 64 N. J. Law, 330, 334 (45 Atl. 634, 48 L. R. A. 616, 81 Am. St. Rep. 504), the court quoted the following extract from the opinion by Mr. Justice North in *Smith* v. *Andrews*, L. R. (1891), 2 Ch. Div. 678, 695:

" 'The idea is sometimes entertained that the right to pass along a public navigable river carries with it the right to fish in it, but so far as regards nontidal rivers this is not so.    No lawyer could take that view. Persons using a navigable highway no more acquire thereby a right to fish there than persons passing along a public highway on land acquire a right to shoot upon it.    Some few passages may be found in the books in which judges are reported to have said that subjects have a right to fish in navigable rivers, just as in the sea; but on investigation it always will be found that they are referring to navigable rivers where the tide ebbs and flows and nothing else.' "

The court also stated (p. 337):

"It may be true that there is here, as there seems to be in England, a common misapprehension on this subject, and that a good deal of fishing that is thought to be of right is only permissive.    But it is not desirable to change an important rule of law merely because it is sometimes misunderstood.    In country life a multitude of acts are habitually committed that are technically trespasses.    Persons walk, catch fish, pick berries and gather nuts *in alieno solo*, without strict right.    Good natured owners tolerate these practices until they become annoying or injurious, and then put a stop to them."

On this subject see *Marsh* v. *Colby*, 39 Mich. 626 (33 Am. Rep. 439).

Counsel for defendant insist the right to fish is an easement incident to the right of navigation.

In *Albright* v. *Cortright, supra*, it was held that

the right to fish and take fish *in* *alieno solo* is not an easement but is a *profit a prendre,* and being such a profit in another's soil, as distinguished from an easement, must be prescribed for in a *que* estate.

The rule at common law in England has always been as quoted by the court in *Smith* v. *Andrews, supra:*

" 'Upon a full consideration of all the cases, it will, I think, appear that no river has been ever held navigable, so as to vest in the crown its bed and soil, and in the public the right of fishing, merely because it has been used as a general highway for the purpose of navigation; and that, beyond the point to which the sea ebbs and flows, even in a river so used for public purposes, the soil is *prima facie* in the riparian owners, and the right of fishing private. * * * There are two totally distinct and different things; the one is the right of property, and the other is the right of navigation. The right of navigation is simply a right of way. * * * Where such a river is navigable, free and open to the public, the right which the public has in such a river is substantially a mere right to use the river for the purposes of navigation similar to the right the public may have to passage along a public road or footpath through a private estate.' "

While fish are *feræ naturæ,* and open to capture in lawful seasons, by those who have a right to be where they are captured, this gives no one a right to fish where he is a trespasser in doing so.

In *Albright* v. *Cortright, supra,* it was stated:

"The question, then, is whether, on this branch of the case, the defendant can justify his acts by force either of common or statute law. He cannot do so by common law, for it is not true that a member of the community, merely as such, may enter the land of another in order to get at something that is devoted to the public. For example, highways and parks are devoted to the public, but one may not, therefore, cross another man's farm in order to reach them. Nor can the defendant prevail by virtue of the acts con-

cerning fish and game, for the legislature cannot confer upon the public a general license to commit trespasses, and if it could do so no such intent will be implied, and the statutes do not express it."

We again quote from 1 Tiffany, Real Property (2d Ed.), p. 1038:

"In one or two States the right of fishing has been regarded as incident to the right of navigation, so as to give the public the right to take fish wherever the waters can be regarded as navigable, irrespective of the fact that the land under the water belongs to private individuals. Such a view is not, however, generally accepted, and is by no means satisfactory from the standpoint of principle. The general rule is that one who owns the land under nontidal waters has the exclusive right to fish thereover, unless he, or his predecessor in interest, has granted the right of fishing to another, creating in him a right of *profit a prendre*."

Defendant was guilty of a trespass, and not saved from action under the public trust theory so generously applied in the opinion of my Brother.

Mr. Henry P. Farnham, in a very able and instructive note in 23 A. L. R. 765, makes the following observations on the trust theory:

"Through a failure to distinguish between the proprietary and prerogative character of the crown's title to the lake beds, or possibly through a failure to remember that the inability of the crown to make such grants at the present time is due to its placing of its desmesnes in trust, as part of the coronation ceremony, many courts in this country have entered into long discussions of the theory that the States here hold the titles to the beds of lakes in trust, which prevents their going into private ownership.

"Such discussions are interesting as matter of history, but are of little practical value in determining the true principles which underlie the granting of such titles."

After citing and quoting from cases, mainly in

Wisconsin, Minnesota, Florida, New Hampshire, Ohio, Tennessee, and Washington, he concludes:

"It will be noticed that the above reasoning is a curious mixture of unacquaintance with what in fact was the common law upon the subject, and confusion of the proprietary and prerogative rights of the crown. It is easy to make precedents, but very difficult to anticipate the ramifications of their application. Courts assume very grave responsibilities when they deliberately depart from the established law which has been the growth of centuries. The above reasoning, applied to the mines, forests, or even the arable land, would transfer their private title to the State as trustee for the public, and establish a communism in place of the present order under which the country has grown and flourished."

Defendant also invokes the following statute:

"That in any of the navigable or meandered waters of this State where fish have been or hereafter may be propagated, planted or spread at the expense of the people of this State or of the United States, the people shall have the right to catch fish with hook and line during such seasons and in such waters as are not otherwise prohibited by the laws of this State.

"No action at law shall be maintained against persons entering upon such waters for the purpose of such fishing, by the owner, lessee or persons having the right of possession of adjoining lands, except for actual damage done." * * * 2 Comp. Laws 1915, §§ 7694, 7695.

This act is a recognition of the common-law right of property we have mentioned and an endeavor to abrogate the same by legislative action. Passing a literal construction which would limit the right of action only of a *riparian* owner and not an owner of the bed of the stream, and also passing the question of whether the act relates only to persons *upon* such waters and not those wading the stream, and giving the act the broad construction invoked by defendant, we have no hesitation in holding that it

affords no protection to defendant. The legislature may regulate or, if need be, prohibit the taking of fish from this stream, but may not grant common right of entry to defendant's property or award immunity for trespass thereon. Such is not due process of law. A similar act was held void in *Hartman* v. *Tresise,* 36 Colo. 146 (84 Pac. 685, 4 L. R. A. [N. S.] 872).

The rights of plaintiff are vested property rights, and cannot be expropriated by legislative permission to the public to enter his close at will.

The judgment should be affirmed, with costs to plaintiff.

BIRD, C. J., and STEERE, J., concurred with WIEST, J.