amounts to a dedication, and what does not, and whether any dedication made by D. H. L., before the passage of the donation act, will bind the after acquired estate, are questions that will properly arise and be determined on the final hearing. This exception is disallowed.

The sixth exception is taken to so much of the answer as is denominated the sixth count in equity. This "count" alleges that on August 14, 1850, L., C. and C. aforesaid, released to the public certain lots in said levee, including the one in controversy; that the release was made upon certain conditions, one of which was, that the suit of Lownsdale v. Parrish, aforesaid, should be dismissed; and that the conditions upon which said release was made have been fulfilled, and the release accepted by the people. That the town has power by its charter, to remove obstructions from the levee, and that complainant derived his title from D. H. L. long after the making and acceptance of said release. In support of this exception it is urged by the complainant that said release appears to have been made before the passage of the donation act—September 27, 1850—when D. H. L., nor any other, had no estate or interest in the land, and that being without covenants, it does not bind an after acquired estate in the premises; and that, if this were otherwise, the release never took effect, because the answer shows that the condition upon which it was given was never fulfilled—namely, the dismissal of the Parrish suit. Upon examination of the authorities, I find the cases upon the point, without exception, concurring in the rule, that a conveyance by deed of bargain and sale or release without covenant, does not bind an after acquired estate in the same land which as to the grantor, was then contingent. Where such after acquired estate is obtained by the grantor from any other source than the title which he assumes to bargain, sell or release, he is not estopped from claiming the premises, even against his own grantee. This release was made when D. H. L., had no interest in the soil. It passed nothing, supposing that it took effect, beyond the mere naked possession which he held under the laws of the provisional government. If he afterwards acquired the title to the premises from the United States under the donation act, it did not inure to the benefit of the public on account of said release. It may be, that where a party has the equitable estate or interest in lands and conveys the same by deed of bargain and sale or quit claim and release, without warranty, and afterwards acquires the legal estate, that while he is not estopped by such deed from asserting said legal estate, equity will compel him to convey it to his grantee of the equitable estate.

Where there is a dedication to public uses, under similar circumstances, without deed, but by acts and declarations of the party

having the equitable estate, the rule seems to be that the after acquired legal estate attaches to the dedication as soon as acquired by operation of law. But there can be no question upon authority that this release does not estop or bar the complainant from asserting his legal title to the premises, and upon the showing of the answer, it would be against equity and good conscience that it should. For while it is true that this portion of the answer avers that the conditions upon which the release was made were fulfilled, elsewhere the answer shows that this averment is not true. At the time the release was executed, it appears that the Parrish suit was pending. It involved the right of Parrish and the public to an easement in the strip of land since called the levee as against the alleged exclusive right of possession of L., C. and C. The terms of a compromise were agreed upon, by which the defendants in that suit were to release a portion of the levee to the public—the latter at the same time relinquishing all claim to the remainder and to procure the dismissal of the pending suit. Yet it appears that the suit was not dismissed, but prosecuted to final decree in the territorial court against the defendants, which decree is now set up in the answer herein as an estoppel. Under the circumstances, to allow the defendants to claim anything under this release, would be in effect to sanction a fraud upon the releasors. This exception must be allowed. The complainant has taken an exception to the separate answer of the recorder, Orville Risley, and also to the like answer of the marshal, James H. Lappeus. Neither of these exceptions is well taken. The matter excepted to may be impertinent, but being in response to his amended bill, the complainant cannot object to it on that ground. Decree, that the first, second, third, fourth and sixth exceptions be allowed and that the remainder be disallowed.

[The case was subsequently heard upon bill, answer, and proofs, upon which a decree for complainant was entered. Case No. 8,579.]

──────

## Case No. 8,579.

LOWNSDALE v. PORTLAND et al.

[1 Deady, 39;[1] 1 Or. 397.]

District Court, D. Oregon. Dec. 6, 1861.

REAL PROPERTY—PUBLIC LANDS—TITLE BY OCCUPANCY — DEDICATION BY OCCUPANT TO PUBLIC USES—PUBLICATION OF MAP — PAROL DECLARATIONS—ACCEPTANCE OF DEDICATION—AFTER-ACQUIRED ESTATE.

1. A dedication of land in Oregon to public use by an occupant thereof, prior to September 27, 1850, does not bind or estop a subsequent occupant of the same lands.

[Cited in Myers v. Reed, 17 Fed. 405.]

──────

1 [Reported by Hon. Matthew P. Deady, District Judge, and here reprinted by permission.]

2. The exhibition or publication of a map or plan of a town by the proprietor thereof, upon which certain spaces are marked as streets and public squares, is evidence of a dedication of such spaces to public use as streets and squares.

3. When a dedication of ground to public uses is attempted to be established by proof of casual conversations and remarks by the owner, susceptible of various meanings and constructions, such proof should be closely scrutinized, and unless in harmony with the established circumstances of the case, but little heeded.

4. As against the general owner, a dedication of land to public use is not to be presumed, but must be proved; and when the evidence consists of the parol acts and declarations of such owner, they ought to be of such public and deliberate character as to be generally known and not of doubtful import.

5. The adoption, by the common council of Portland, of a map upon which Front street is represented as being bounded by two parallel lines, so as not to include a strip of land lying between it and the Wallamet river on the east, is a solemn admission by the corporation of Portland that said strip of land is not a part of Front street.

6. A release without covenants by a party in possession does not affect an after-acquired estate in the same lands by the releasor.

[Cited in Myers v. Reed, 17 Fed. 405.]

[This was a suit by J. P. O. Lownsdale against the city of Portland, George C. Robbins, Jacob Davidson, A. D. Shelby, Jacob Stitzel, William S. Higgins, J. C. Ainsworth, M. M. Lucas, Erasmus D. Shattuck, Absalom B. Hallock, Orville Risley, and James H. Lappeus, seeking to enjoin the defendants from trespass upon and to quiet title to certain lots. For a former hearing upon exceptions to the bill, see Case No. 8,578.]

George H. Williams, W. W. Page, and A. C. Gibbs, for complainant.

George Cartter and John H. Mitchel, for defendant.

DEADY, District Judge. This suit was commenced November 9, 1860, to enjoin the defendants from trespassing upon lots 1, 2 and 3 in block 74 of the town of Portland, and to quiet the title of complainant thereto. On June 8, it was heard upon exceptions for impertinence to the amended answer. On December 5, it was finally heard upon the amended bill, answer thereto and proofs, and submitted on written arguments afterwards filed, and taken under advisement. By his amended bill the complainant alleges that he is a citizen of Indiana; that he is the legal owner and entitled to the exclusive possession of lots 1, 2 and 3 in block 74 in the town of Portland, and has been seized in fee of the same and had the possession thereof since about January 1, 1853; that in pursuance of a long-contemplated purpose, about July 1, 1859, he caused piles to be driven and the framework for wharves to be erected on said lots, and that said improvements are of the value of about $1,000; that said improvements were made without objection or hindrance on the part of the de-

fendants, but that the defendants have since threatened to remove, tear down and destroy the same, and have arrested the agents and employés of complainant engaged on said improvements, and now hold them in custody without authority of law; that the defendants falsely and wrongfully allege that the town of Portland has some right or title in and to said lots adverse to the complainant, and by reason thereof defendants make said threats and will execute them unless restrained, but that said town has no right or interest in such lots either at law or in equity; that said lots are worth about $12,-000, but if the defendants be permitted to execute said threats, they will be valueless to complainant, and the complainant will suffer great and irreparable damage; and that by reason of the false and wrongful representations aforesaid, many persons suspect that complainant's title is invalid, with a prayer for a perpetual injunction.

The separate amended answer of the town of Portland denies the material allegations of the amended bill, and then pleads by way of answer that in the year 1845, the present site of Portland was laid off in blocks, lots, streets, squares, and a levee, by Francis W. Pettigrove and Abbot L. Lovejoy, and that said streets, squares and levee, were dedicated to the use of the public by said P. and L. forever; that the people of Portland accepted such dedication, and occupied and possessed the same up to the year 1849, when the said P. and L. transferred all their right to the land claim upon which the town was laid out to Daniel H. Lownsdale, and that said D. H. L. recognized and affirmed said dedication, and did particularly represent and state that the strip of land now called the levee and then Water street, was public property, and by reason of such representations did sell lots adjoining thereto at enhanced prices; and that the people of Portland have always had the use of the same except where wrongfully deprived of it by private claimants, and that D. H. L. has never paid any taxes on said lots; that the premises in controversy are within said dedication, and D. H. L. claims to have acquired title to the same since such dedication, and that the complainant claims through said D. H. L., and is therefore barred from asserting any interest in the premises as against this defendant. And for further answer, that the town is authorized by its charter to prevent and remove nuisances and obstructions from the streets and the Wallamet river within its limits, and that the common council thereof on August 2, 1860, passed an ordinance to prevent and remove obstructions from the Wallamet river and the levee thereon, between Washington and Main streets.

The defendant, Orville Risley, by his separate answer says that by virtue of his office of recorder, and the ordinance of August 2, 1860, he issued a warrant for the arrest of the agents and employés of the complainant

engaged in erecting improvements on the lots in question.

The defendant, James H. Lappeus, by his separate answer says that by virtue of his office of marshal and the warrant aforesaid he arrested the agents and employés aforesaid.

From the pleadings and proofs certain facts appear to be established in this case, which it will be well to state in their chronological order, before proceeding to investigate those that are controverted and about which doubts may exist. Sometime in 1845 Pettigrove and Lovejoy took up the land claim of 640 acres upon which the town of Portland is now built and occupied it until September 22, 1848, under the land law of the provisional government, the title thereto being in the United States, during which time they laid out some portion of it in blocks, lots and streets, and that on said September 22 they abandoned or transferred their possession to Daniel H. Lownsdale, and that sometime in the year 1849, Stephen Coffin and W. W. Chapman became joint occupants and interested in the possession of the land claim with D. H. L. That afterwards said D. H. L., under the donation act of September 27, 1850 (9 Stat. 497), became a settler upon one third of such land claim, including the premises in controversy, and by virtue of the required four years residence and cultivation, as evidenced by the donation certificate [Ex. A, p. 1, Ev.] [2] became the legal owner thereof, and on September 20, 1851 [Ex. B. & C., p. 1 and 2, Ev.], [2] by deed duly executed, conveyed said lot 3, and on January 1, 1853, said lots 1 and 2, to complainant; that on April 29, 1852, the common council of Portland, by resolution, adopted the plat of the town "drawn by John Brady as the city plot" [Ex. F, p. 9, Ev.], [2] and that said council, by ordinance, passed August 2, 1860, asserted the strip of land east of Front street to be a public levee, and provided for removing all obstructions therefrom, which ordinance was by said council repealed on June 14, 1861, and on August 6, 1861, said council passed an ordinance declaring said strip of land to be private property, and permitted the holders thereof to build wharves, wharf-houses and docks thereon; [Ex. E., p. 9, Ev.] [3] that in the years 1854 and 1858 the town of Portland assessed the premises for the purpose of taxation, and that said taxes were paid to the town by D. H. L. for complainant; and that D. H. L., on April 20, 1851, and for six successive weeks thereafter, published a notice in the weekly Oregonian, a paper of general circulation in the town of Portland, that he claimed the land east of Front street, including the premises in controversy, and warned all persons from trespassing thereon.

Both parties admit the title of D. H. L. The complainant claims under him by a pa-

per title which has been satisfactorily proved. He is also shown to have been in the actual possession of the premises at the commencement of this suit and as far back as July of the same year. Whether the premises were actually occupied by him before that time does not distinctly appear; but the title draws to it the possession and he would be presumed to have it, if material to his rights, unless the contrary were shown. The defendant also claims under D. H. L. by dedication to public use. The defendant alleges that this dedication was originally made by P. and L., but this allegation is not supported by any evidence whatever. On the contrary the evidence tends to show that P. and L. held and occupied the property now called the levee as private property. They had upon it a private wharf and slaughterhouse, and used them as such. [See Ev. Robinson, p. 8; Ev. of King, p. 11.] [3] But if the fact were otherwise, and it appeared beyond doubt that P. and L. did make such dedication, it would be immaterial. They had nothing in the land to dedicate. They were mere occupants of the public land; had only the naked possession, which terminated with such occupancy, and could not by any act of theirs charge the lands in the hands of any subsequent occupant with any easement or encumbrance whatever. This question was fully considered and discussed when this case was before the court on exceptions for impertinence. Lownsdale v. Portland [Case No. 8,578].

It is also alleged that D. H. L., after he came into the possession of the land claim, ratified and confirmed such dedication by general representations to the public, as well as particular ones made to persons to whom he sold lots lying contiguous to said levee. Neither is this allegation supported by any evidence whatever. And from the fact that no such general or special representations have been proven, although if made the fact must be known to many persons now living here, I conclude that the allegation is absolutely untrue as well as unproved.

This disposes of the question of dedication so far as it distinctly appears upon the pleadings; but on the trial evidence was offered to show a special and original dedication by D. H. L., jointly with Coffin and Chapman after they had been admitted into the possession of the land claim with him. In considering this evidence, it is well to bear in mind that D. H. L. was the owner of this property, and that the burden of proof is upon the town to show such dedication. It should be clear and cogent, and when it consists of casual and disjointed conversations and remarks, often indifferent in themselves and susceptible of various interpretations and colorings, owing to the prepossessions and prejudices of the witnesses who detail them, it should be closely scrutinized, and unless in harmony

---

[2] [From 1 Or. 402.]
[3] [From 1 Or. 403.]

[3] [From 1 Or. 403.]

with the established circumstances of the case, but little heeded. Security and certainty of title to real property are among the most important objects of the law in any civilized community. Any act intended and permitted to affect the ownership or use of such property the law requires to be done or suffered with certain solemnities and formalities, so that the fact may be read and known of all men. What is shown to have once belonged to a person he is not presumed to have parted with; but the fact, if claimed, must be satisfactorily proved. And, although from the nature of the case, a dedication of streets and public grounds in towns may be shown by acts and declarations in parol, they ought to be of such a public and deliberate character as would make them generally known, and not of doubtful import. Of this character are the exhibition or publishing of a map of a town, with certain spaces marked thereon as streets or public squares. But it is too apparent to admit of doubt that the introduction of this evidence was an indirect attempt on the part of defendant to avail itself of the release which was held to be invalid and insufficient for this purpose on the exceptions to the amended answer for impertinence. The only witnesses who speak of this alleged dedication, are W. W. Chapman and Shubrick Norris, and they both state that it occurred in the summer of 1850, and that it was the controversy which resulted in this release. Now, the nature of that transaction seems to have been this: From the time of his occupation of the claim to July, 1850, D. H. L. appears to have been in the undisputed possession of the strip of land now called the levee, east of Water, now called Front, street, as much so at least as of any other undisposed part if it. Up to this time no one has been found who ever heard even of any dedication of this land to the public by any one, let alone D. H. L. In the fall of 1848 he is shown to have kept a private wharf upon it, for hire. The person who attended the wharf testifies to the fact. The wharf was afterwards accidentally carried off by the river. In April, 1850, D. H. L. had the town surveyed by R. V. Short, who then laid off this strip of land into fractional blocks and lots, which were openly sold to the public. By this survey, Front street, instead of extending to the Wallamet river, was bounded on the east by a line parallel with the west side of it, making a street of the usual width of other streets in the town, and continuing the streets that crossed it at right angles to the water. After all this, in July, 1850, while a building was going up in one of these fractional blocks east of Front street, Parrish, the occupant of a lot on the opposite side of the street, commenced a suit to enjoin the erection of the building. At this time D. H. L. was in San Francisco. He came home soon after, and, on hearing of the matter, said to Chapman, who had acted as his agent in his absence, that he had not intended to have that piece of ground built upon, but intended it for wharves. Apart from the written release, this is the only word of D. H. L.'s, one way or the other, that the defendant has shown upon the subject of this alleged dedication.

Does it amount to a dedication, or imply that one had been made? Certainly not, even when considered apart from the strong qualifying circumstances; but when taken in connection with his continued and open acts of ownership and occupation before or since, it would be preposterous to draw any such inference from this single expression. The declaration is one which might very naturally and properly be made by a town proprietor, upon finding that his agent, in his absence, had authorized or permitted an ordinary building to be erected on a block which he had reserved or set apart to build a wharf upon. The words plainly imply a private ownership on the part of D. H. L. inconsistent with an existing public use, and a purpose to have used it in the future as a private wharf-ground for his own benefit. However, in the language of witness Chapman, for the purpose of "buying peace" and getting rid of the suit which would disparage and prevent the settlement and growth of the new town—then struggling for recognition as a place of promise and future importance—a compromise was arranged by which L. C. and C. agreed to release to the public that portion of said strip of land lying between Main and Washington streets, which includes block 74, on condition that said suit should be dismissed. This condition was never performed, and the release never took effect. Doubtless, from thence until the fall term of the court in which the suit was pending and to be dismissed, the understanding of all parties was that according to and in pursuance of the terms of this compromise, the above mentioned portion of said strip of land was to be left open to public use as a levee or landing. This period was about one month. But the suit was not dismissed. It was kept hanging over the town and retarding its growth to the special injury of the releasors. Whatever the cause for this failure to perform the condition in the release, it was no fault of the releasor, D. H. L., and the public took nothing by the transaction.

I have been induced to state the particulars of this transaction, which is here sought to be distorted into an absolute dedication, by keeping out of sight the release itself, while showing the general impression of the public and the casual conduct of the releasors after it was executed and before it was known that its conditions would not be complied with, more for the purpose of showing that the claim of the defendant is without any merit, than for the purpose of determining its legal effect.

Upon the exceptions for impertinence in this case the court held that if the release

had been unconditional, being a mere quitclaim without covenant from a mere occupant having no title, it would not bar the releasor from asserting the after acquired title from the United States. Lownsdale v. Portland [Case No. 8,578]. The rule of law upon this question is established beyond doubt. The authorities go in one unbroken current to the effect stated. But not only has the defendant failed to prove a dedication to public use, but upon the whole evidence, it satisfactorily appears, that there never was any such dedication or intention to make it, apart from the proceedings connected with the giving of the release. The map drawn by John Brady from the survey of Short, is in evidence. The latter recognizes it and testifies that it was made from his survey. The map is without date, but it is proven that the Short survey was made in the spring of 1850, and Short also testifies that he saw the Brady map in Portland in the fall of that year. From the inspection of that map it plainly appears that Front street is bounded by two parallel lines, and that the strip of land between the east line of said street and the Wallamet river is laid off in blocks and lots varying in depth with the meanderings of the river. Nothing appearing to the contrary, this fact alone is sufficient to decide the question against the defendant. Nor is this all; the defendant, on April 29, 1852, by a resolution of its common council, deliberately recognized and adopted this map as a correct representation of the plat of the streets and blocks and lots delineated thereon. In the year 1854 the corporate authorities assessed the premises in controversy as private property and collected the tax in 1855. The same thing was done in 1858. D. H. L. always claimed this so-called levee as private property and constantly asserted his right to it, by notice to the public, by sales of portions of it, by actual occupation from time to time, and by payment of taxes levied thereon by defendant. Even since the commencement of this suit the defendant has, by two different ordinances passed by its common council, deliberately admitted that the levee was private property. Ordinances of June 14 and August 6, 1861. The complainant is shown to be the legal owner of the premises, and it does not appear that they were ever dedicated to public use by the grantor of the complainant, or any one else. The defendant did, and was threatening and proceeding to continue to commit the trespasses complained under a claim of right or use in the premises.

Decree, that the town of Portland, and the corporate authorities thereof, of whatever name or nature, be perpetually enjoined from asserting any right, title, or interest in said premises, or in any way trespassing upon or molesting the complainant in the occupation and use thereof by reason of the supposed dedication in its answer alleged and set up, and for costs.

LOWREY (WHARTON v.). See Case No. 17,481.

LOWRY (BLYDENBURGH v.). See Case No. 1,582.

## Case No. 8,580.
### LOWRY v. CANAL BOAT.
[See Case No. 8,582.]

## Case No. 8,581.
LOWRY v. COMMERCIAL & FARMERS' BANK et al.

[Taney, 310:[1] 3 Am. Law J. (N. S.) 111; Brunner, Col. Cas. 331; 6 West. Law J. 121.]

Circuit Court, D. Maryland. April Term, 1848.

EXECUTOR—BEQUEST OF BANK-STOCK—PLEDGE FOR INDIVIDUAL DEBT—NOTICE—TRANSFER OF STOCK—LIABILITY OF BANK FOR IMPROPER TRANSFER—LIABILITY FOR TESTATOR'S DEBTS.

1. Bank-stock was bequeathed to the testator's executors, and the survivor of them, to pay the dividends to one for life, with remainder over; and the executors were, by a decree in chancery. directed to hold the same in trust to pay the dividends to the devisee for life, and after her death, to divide the stock between those in remainder. The testator died rich; and several years after his death, and after all his debts were paid, one of the executors pledged the stock, which was still standing in the testator's name, to another bank to secure his individual debt; the debt being afterwards paid. the stock was transferred to T. J. & Co., one of the executors being the sole member of that firm, and was by him re-transferred into the names of himself and his co-executor, as executors. Afterwards he, signing his name as acting executor, again pledged the stock to the said bank, to secure other debts of the firm of T. J. & Co.; and a note. for which said stock was held in pledge. not being paid, in consequence of the failure and entire insolvency of the firm of T. J. & Co.. the stock was sold, and the proceeds applied to its payment. leaving a balance in the hands of the bank. The last dividend on the stock, before it was sold, was received and retained by the bank; but the other dividends, which accrued whilst the stock was in pledge, were received by the said executor; those first received were paid over by him to the legatee for life. but the others were not. On a bill filed by the legatee for life. who was an alien residing in Ireland. to recover the dividends due to her. *held*: That as the bank, to whom the stock was pledged. paid a valuable consideration for it, and had no notice. actual or constructive, of any violation of trust. upon which the transfer could be impeached in equity, it had a right to sell the stock for the payment of the note for which it was pledged. and to make the purchasers a valid title.

2. Purchasers of stock are not bound to look beyond the certificate, or to examine the books of the corporation, to ascertain the validity of the transfer.

[Cited in Pratt v. Taunton Copper Co., 123 Mass. 112.]

3. But the corporation whose stock is transferred. is made the custodian of the shares, and is clothed with power to protect the rights of every one from unauthorized transfers. It is a trust placed in its hands for the protection of individual interests. and like every other trustee. it is bound to execute the trust with proper dili-

---

[1] [Reported by James Mason Campbell, Esq., and here reprinted by permission.]