Argued September 8, affirmed December 19, 1969

## STATE ex rel THORNTON et al, *Respondents, v.* HAY et al, *Appellants.*

462 P. 2d 671

*Gerard K. Drummond,* Portland, argued the cause for appellants. With him on the briefs were Kell & Alterman and Rives, Bonyhadi & Hall, Portland.

*Peter S. Herman,* Assistant Attorney General,

Salem, argued the cause for respondents. With him on the supplemental answering brief was Lee Johnson, Attorney General, Salem. On the respondents' brief were Robert Y. Thornton, then Attorney General, and G. E. Rohde, Chief Counsel, F. C. McKinney, Assistant Counsel, and Philip J. Engelgau, Assistant Attorney, Oregon State Highway Department, Salem.

C. Ray Johnson, George P. Winslow, Jr., and George P. Winslow, Tillamook, filed a brief as amici curiae.

Before PERRY, Chief Justice, and McALLISTER, O'CONNELL, GOODWIN, DENECKE and HOLMAN, Justices.

GOODWIN, J.

William and Georgianna Hay, the owners of a tourist facility at Cannon Beach, appeal from a decree which enjoins them from constructing fences or other improvements in the dry-sand area between the sixteen-foot elevation contour line and the ordinary high-tide line of the Pacific Ocean.

The issue is whether the state has the power to prevent the defendant landowners from enclosing the dry-sand area contained within the legal description of their ocean-front property.

The state asserts two theories: (1) the landowners' record title to the disputed area is encumbered by a superior right in the public to go upon and enjoy the land for recreational purposes; and (2) if the disputed area is not encumbered by the asserted public easement, then the state has power to prevent construction under zoning regulations made pursuant to ORS 390.640.

The defendant landowners concede that the State

Highway Commission has standing to represent the rights of the public in this litigation, ORS 390.620, and that all tideland lying seaward of the ordinary, or mean high-tide line is a state recreation area as defined in ORS 390.720.[1]

From the trial record, applicable statutes, and court decisions, certain terms and definitions have been extracted and will appear in this opinion. A short glossary follows:

ORS 390.720 refers to the "ordinary" high-tide line, while other sources refer to the "mean" high-tide line. For the purposes of this case the two lines will be considered to be the same. The mean high-tide line in Oregon is fixed by the 1947 Supplement to the 1929 United States Coast and Geodetic Survey data.

The land area in dispute will be called the dry-sand area. This will be assumed to be the land lying between the line of mean high tide and the visible line of vegetation.[2]

The vegetation line is the seaward edge of vegetation where the upland supports vegetation. It falls generally in the vicinity of the sixteen-foot-elevation contour line, but is not at all points necessarily identical with that line. Differences between the vegetation

---

[1] ORS 390.720 provides:

"Ownership of the shore of the Pacific Ocean between ordinary high tide and extreme low tide, and from the Oregon and Washington state line on the north to the Oregon and California state line on the south, excepting such portions as may have been disposed of by the state prior to July 5, 1947, is vested in the State of Oregon, and is declared to be a state recreation area. No portion of such ocean shore shall be alienated by any of the agencies of the state except as provided by law."

[2] A similar, but more colorful, description of the vegetation-line, mean-high-tide-line problem on the island of Molokai may be found in Application of Ashford, 50 Haw 314, 440 P2d 76 (1968).

line and the sixteen-foot line are irrelevant for the purposes of this case.

The sixteen-foot line, which is an engineering line and not a line visible on the ground, is mentioned in ORS 390.640, and in the trial court's decree.

The extreme high-tide line and the high-water mark are mentioned in the record, but will be treated as identical with the vegetation line. While technical differences between extreme high tide and the high-water mark, and between both lines and the sixteen-foot line, might have legal significance in some other litigation, such differences, if any, have none in this case. We cite these variations in terminology only to point out that the cases and statutes relevant to the issues in this case, like the witnesses, have not always used the same words to describe similar topographical features.

Below, or seaward of, the mean high-tide line, is the state-owned foreshore, or wet-sand area, in which the landowners in this case concede the public's paramount right, and concerning which there is no justiciable controversy.

The only issue in this case, as noted, is the power of the state to limit the record owner's use and enjoyment of the dry-sand area, by whatever boundaries the area may be described.

The trial court found that the public had acquired, over the years, an easement for recreational purposes to go upon and enjoy the dry-sand area, and that this easement was appurtenant to the wet-sand portion of the beach which is admittedly owned by the state and designated as a "state recreation area."

 Because we hold that the trial court correctly found in favor of the state on the rights of the public in the dry-sand area, it follows that the state has an

equitable right to protect the public in the enjoyment of those rights by causing the removal of fences and other obstacles.

It is not necessary, therefore, to consider whether ORS 390.640 would be constitutional if it were to be applied as a zoning regulation to lands upon which the public had not acquired an easement for recreational use.

In order to explain our reasons for affirming the trial court's decree, it is necessary to set out in some detail the historical facts which lead to our conclusion.

The dry-sand area in Oregon has been enjoyed by the general public as a recreational adjunct of the wet-sand or foreshore area since the beginning of the state's political history. The first European settlers on these shores found the aboriginal inhabitants using the foreshore for clam digging and the dry-sand area for their cooking fires. The newcomers continued these customs after statehood. Thus, from the time of the earliest settlement to the present day, the general public has assumed that the dry-sand area was a part of the public beach, and the public has used the dry-sand area for picnics, gathering wood, building warming fires, and generally as a headquarters from which to supervise children or to range out over the foreshore as the tides advance and recede. In the Cannon Beach vicinity, state and local officers have policed the dry sand, and municipal sanitary crews have attempted to keep the area reasonably free from man-made litter.

Perhaps one explanation for the evolution of the custom of the public to use the dry-sand area for recreational purposes is that the area could not be

used conveniently by its owners for any other purpose. The dry-sand area is unstable in its seaward boundaries, unsafe during winter storms, and for the most part unfit for the construction of permanent structures. While the vegetation line remains relatively fixed, the western edge of the dry-sand area is subject to dramatic moves eastward or westward in response to erosion and accretion. For example, evidence in the trial below indicated that between April 1966 and August 1967 the seaward edge of the dry-sand area involved in this litigation moved westward 180 feet. At other points along the shore, the evidence showed, the seaward edge of the dry-sand area could move an equal distance to the east in a similar period of time.

Until very recently, no question concerning the right of the public to enjoy the dry-sand area appears to have been brought before the courts of this state. The public's assumption that the dry sand as well as the foreshore was "public property" had been reinforced by early judicial decisions. See *Shively v. Bowlby,* 152 US 1, 14 S Ct 548, 38 L Ed 331 (1894), which affirmed *Bowlby v. Shively,* 22 Or 410, 30 P 154 (1892). These cases held that landowners claiming under federal patents owned seaward only to the "high-water" line, a line that was then assumed to be the vegetation line.[9]

---

[9] One of the issues in the *Bowlby* litigation was the right to wharf out from the upland. The state had sold to various private owners certain tidelands seaward of Shively's uplands. Shively, in an early plat, had overlapped his platted lots upon state-owned tidelands. The controversy concerned the foreshore generally. The litigants were not then particularly interested in "dry" versus "wet" sand, because a wharf must cross both "dry" and "wet" sand if such topography lies between the upland

In 1935, the United States Supreme Court held that a federal patent conveyed title to land farther seaward, to the mean high-tide line. *Borax, Ltd. v. Los Angeles*, 296 US 10, 56 S Ct 23, 80 L Ed 9 (1935). While this decision may have expanded seaward the record ownership of upland landowners, it was apparently little noticed by Oregonians. In any event, the *Borax* decision had no discernible effect on the actual practices of Oregon beachgoers and upland property owners.

Recently, however, the scarcity of ocean-front building sites has attracted substantial private investments in resort facilities. Resort owners like these defendants now desire to reserve for their paying guests the recreational advantages that accrue to the dry-sand portions of their deeded property. Consequently, in 1967, public debate and political activity resulted in legislative attempts to resolve conflicts between public and private interests in the dry-sand area:

ORS 390.610 "(1) The Legislative Assembly hereby declares it is the public policy of the State of Oregon to forever preserve and maintain the sovereignty of the state heretofore existing over the seashore and ocean beaches of the state from the Columbia River on the North to the Oregon-California line on the South so that the public may have the free and uninterrupted use thereof.

"(2) The Legislative Assembly recognizes that over the years the public has made frequent and uninterrupted use of lands abutting, adjacent and contiguous to the public highways and state recrea-

---

and deep water. The state's title to the tidelands was confirmed to the "high-water mark." Most private landowners in Oregon apparently assumed after *Bowlby* that their patented lands run seaward only to the "high-water mark," which is also, for all practical purposes, the vegetation line.

tion areas and recognizes, further, that where such use has been sufficient to create easements in the public through dedication, prescription, grant or otherwise, that it is in the public interest to protect and preserve such public easements as a permanent part of Oregon's recreational resources.

"(3) Accordingly, the Legislative Assembly hereby declares that all public rights and easements in those lands described in subsection (2) of this section are confirmed and declared vested exclusively in the State of Oregon and shall be held and administered in the same manner as those lands described in ORS 390.720.

"* * * * * *"

The state concedes that such legislation cannot divest a person of his rights in land, *Hughes v. Washington*, 389 US 290, 88 S Ct 438, 19 L Ed 2d 530 (1967), and that the defendants' record title, which includes the dry-sand area, extends seaward to the ordinary or mean high-tide line. *Borax, Ltd. v. Los Angeles,* supra.

The landowners likewise concede that since 1899 the public's rights in the foreshore have been confirmed by law as well as by custom and usage. Oregon Laws 1899, p. 3, provided:

"That the shore of the Pacific ocean, between ordinary high and extreme low tides, and from the Columbia river on the north to the south boundary line of Clatsop county on the south, is hereby declared a public highway, and shall forever remain open as such to the public."

The disputed area is *sui generis*. While the foreshore is "owned" by the state, and the upland is "owned" by the patentee or record-title holder, neither can be said to "own" the full bundle of rights normally

connoted by the term "estate in fee simple." 1 Powell, Real Property § 163, at 661 (1949).

In addition to the *sui generis* nature of the land itself, a multitude of complex and sometimes over-lapping precedents in the law confronted the trial court. Several early Oregon decisions generally support the trial court's decision, i.e., that the public can acquire easements in private land by long-continued user that is inconsistent with the owner's exclusive possession and enjoyment of his land. A citation of the cases could end the discussion at this point. But because the early cases do not agree on the legal theories by which the results are reached, and because this is an important case affecting valuable rights in land, it is appropriate to review some of the law applicable to this case.

One group of precedents relied upon in part by the state and by the trial court can be called the "implied-dedication" cases. The doctrine of implied dedication is well known to the law in this state and else-where. See cases collected in Parks, *The Law of Dedication in Oregon,* 20 Or L Rev 111 (1941). Dedication, however, whether express or implied, rests upon an intent to dedicate.[4] In the case at bar, it is un-

---

[4] Because of the elements of public interest and estoppel running through the cases, intent to dedicate is sometimes "presumed" instead of proven. But conceptually, at least, dedication is founded upon an intent to dedicate. Security and Investment Co. v. Oregon City, 161 Or 421, 433, 90 P2d 467 (1939); City of Clatskanie v. McDonald, 85 Or 670, 674, 167 P 560 (1917); Portland Ry., L. & P. Co. v. Oregon City, 85 Or 574, 582, 166 P 932 (1917); Harris v. St. Helens, 72 Or 377, 386, 143 P 941 (1914); Parrott v. Stewart, 65 Or 254, 259, 132 P 523 (1913); Lownsdale v. City of Portland, 1 Or 397, 405 (1861). See, also, Nicholas v. Title & Trust Co., 79 Or 226, 154 P 391 (1916); Kuck v. Wakefield, 58 Or 549, 555, 115 P 428 (1911). Additional cases are collected in Parks, *The Law of Dedication in Oregon,* 20 Or L Rev 111 (1941).

likely that the landowners thought they had anything to dedicate, until 1967, when the notoriety of legislative debates about the public's rights in the dry-sand area sent a number of ocean-front landowners to the offices of their legal advisers.

A second group of cases relied upon by the state, but rejected by the trial court, deals with the possibility of a landowner's losing the exclusive possession and enjoyment of his land through the development of prescriptive easements in the public.

In Oregon, as in most common-law jurisdictions, an easement can be created in favor of one person in the land of another by uninterrupted use and enjoyment of the land in a particular manner for the statutory period, so long as the user is open, adverse, under claim of right, but without authority of law or consent of the owner. *Feldman et ux v. Knapp et ux,* 196 Or 453, 476, 250 P2d 92 (1952); *Coventon v. Seufert,* 23 Or 548, 550, 32 P 508 (1893). In Oregon, the prescriptive period is ten years. ORS 12.050. The public use of the disputed land in the case at bar is admitted to be continuous for more than sixty years. There is no suggestion in the record that anyone's permission was sought or given; rather, the public used the land under a claim of right. Therefore, if the public can acquire an easement by prescription, the requirements for such an acquisition have been met in connection with the specific tract of land involved in this case.

The owners argue, however, that the general public, not being subject to actions in trespass and ejectment, cannot acquire rights by prescription, because the statute of limitations is irrelevant when an action does not lie.

While it may not be feasible for a landowner to sue the general public, it is nonetheless possible by means of signs and fences to prevent or minimize public invasions of private land for recreational purposes. In Oregon, moreover, the courts and the Legislative Assembly have both recognized that the public can acquire prescriptive easements in private land, at least for roads and highways. See, e.g., *Huggett et ux v. Moran et ux,* 201 Or 105, 266 P2d 692 (1954), in which we observed that counties could acquire public roads by prescription. And see ORS 368.405, which provides for the manner in which counties may establish roads. The statute enumerates the formal governmental actions that can be employed, and then concludes: "This section does not preclude acquiring public ways by adverse user."

Another statute codifies a policy favoring the acquisition by prescription of public recreational easements in beach lands. See ORS 390.610. While such a statute cannot create public rights at the expense of a private landowner, the statute can, and does, express legislative approval of the common-law doctrine of prescription where the facts justify its application. Consequently, we conclude that the law in Oregon, regardless of the generalizations that may apply elsewhere,[9] does not preclude the creation of prescriptive easements in beach land for public recreational use.

---

[9] See, e.g., Sanchez v. Taylor, 377 F2d 733, 738 (10th Cir 1967), holding that the general public cannot acquire grazing rights in unfenced land. Among other reasons assigned by authorities cited in Sanchez v. Taylor are these: prescription would violate the rule against perpetuities because no grantee could ever convey the land free of the easement; and prescription rests on the fiction of a "lost grant," which state of affairs cannot apply to the general public. The first argument can as well be made against the public's acquiring rights by express dedication; and the second argument applies equally to the fictional aspects

Because many elements of prescription are present in this case, the state has relied upon the doctrine in support of the decree below. We believe, however, that there is a better legal basis for affirming the decree. The most cogent basis for the decision in this case is the English doctrine of custom. Strictly construed, prescription applies only to the specific tract of land before the court, and doubtful prescription cases could fill the courts for years with tract-by-tract litigation. An established custom, on the other hand, can be proven with reference to a larger region. Ocean-front lands from the northern to the southern border of the state ought to be treated uniformly.

The other reason which commends the doctrine of custom over that of prescription as the principal basis for the decision in this case is the unique nature of the lands in question. This case deals solely with the dry-sand area along the Pacific shore, and this land has been used by the public as public recreational land according to an unbroken custom running back in time as long as the land has been inhabited.

A custom is defined in Bouvier's Law Dictionary as "such a usage as by common consent and uniform practice has become the law of the place, or of the subject matter to which it relates."

In 1 Blackstone, Commentaries *75–*78, Sir William Blackstone set out the requisites of a particular custom.

Paraphrasing Blackstone, the first requirement of a custom, to be recognized as law, is that it must be

---

of the doctrine of implied dedication. Both arguments are properly ignored in cases dealing with roads and highways, because the utility of roads and the public interest in keeping them open outweighs the policy favoring formal over informal transfers of interests in land.

ancient. It must have been used so long "that the memory of man runneth not to the contrary." Professor Cooley footnotes his edition of Blackstone with the comment that "long and general" usage is sufficient. In any event, the record in the case at bar satisfies the requirement of antiquity. So long as there has been an institutionalized system of land tenure in Oregon, the public has freely exercised the right to use the dry-sand area up and down the Oregon coast for the recreational purposes noted earlier in this opinion.

The second requirement is that the right be exercised without interruption. A customary right need not be exercised continuously, but it must be exercised without an interruption caused by anyone possessing a paramount right. In the case at bar, there was evidence that the public's use and enjoyment of the dry-sand area had never been interrupted by private landowners.

Blackstone's third requirement, that the customary use be peaceable and free from dispute, is satisfied by the evidence which related to the second requirement.

The fourth requirement, that of reasonableness, is satisfied by the evidence that the public has always made use of the land in a manner appropriate to the land and to the usages of the community. There is evidence in the record that when inappropriate uses have been detected, municipal police officers have intervened to preserve order.

The fifth requirement, certainty, is satisfied by the visible boundaries of the dry-sand area and by the character of the land, which limits the use thereof to recreational uses connected with the foreshore.

The sixth requirement is that a custom must be obligatory; that is, in the case at bar, not left to the option of each landowner whether or not he will recognize the public's right to go upon the dry-sand area for recreational purposes. The record shows that the dry-sand area in question has been used, as of right, uniformly with similarly situated lands elsewhere, and that the public's use has never been questioned by an upland owner so long as the public remained on the dry sand and refrained from trespassing upon the lands above the vegetation line.

Finally, a custom must not be repugnant, or inconsistent, with other customs or with other law. The custom under consideration violates no law, and is not repugnant.

Two arguments have been arrayed against the doctrine of custom as a basis for decision in Oregon. The first argument is that custom is unprecedented in this state, and has only scant adherence elsewhere in the United States. The second argument is that because of the relative brevity of our political history it is inappropriate to rely upon an English doctrine that requires greater antiquity than a newly-settled land can muster. Neither of these arguments is persuasive.

The custom of the people of Oregon to use the dry-sand area of the beaches for public recreational purposes meets every one of Blackstone's requisites. While it is not necessary to rely upon precedent from other states, we are not the first state to recognize custom as a source of law. See *Perley et ux'r v. Langley*, 7 NH 233 (1834).

On the score of the brevity of our political history, it is true that the Anglo-American legal system on

this continent is relatively new. Its newness has made it possible for government to provide for many of our institutions by written law rather than by customary law.[⊙] This truism does not, however, militate against the validity of a custom when the custom does in fact exist. If antiquity were the sole test of validity of a custom, Oregonians could satisfy that requirement by recalling that the European settlers were not the first people to use the dry-sand area as public land.

Finally, in support of custom, the record shows that the custom of the inhabitants of Oregon and of visitors in the state to use the dry sand as a public recreation area is so notorious that notice of the custom on the part of persons buying land along the shore must be presumed. In the case at bar, the landowners conceded their actual knowledge of the public's long-standing use of the dry-sand area, and argued that the elements of consent present in the relationship between the landowners and the public precluded the application of the law of prescription. As noted, we are not resting this decision on prescription, and we

---

[⊙] The English law on customary rights grew up in a small island nation at a time when most inhabitants lived and died without traveling more than a day's walk from their birthplace. Most of the customary rights recorded in English cases are local in scope. The English had many cultural and language groups which eventually merged into a nation. After these groups developed their own unique customs, the unified nation recognized some of them as law. Some American scholars, looking at the vast geography of this continent and the freshness of its civilization, ·have concluded that there is no need to look to English customary rights as a source of legal rights in this country. See, e.g., 6 Powell, Real Property § 934, note 5, at 362 (1949). Some of the generalizations drawn·by the text writers from English cases would tend to limit customary rights to specific usages in English towns and villages. See Gray, The Rule Against Perpetuities §§ 572-588 (1942). But it does not follow that a custom, established in fact, cannot have regional application and be enjoyed by a larger public than the inhabitants of a single village.

leave open the effect upon prescription of the type of consent that may have been present in this case. Such elements of consent are, however, wholly consistent with the recognition of public rights derived from custom.

Because so much of our law is the product of legislation, we sometimes lose sight of the importance of custom as a source of law in our society. It seems particularly appropriate in the case at bar to look to an ancient and accepted custom in this state as the source of a rule of law. The rule in this case, based upon custom, is salutary in confirming a public right, and at the same time it takes from no man anything which he has had a legitimate reason to regard as exclusively his.

For the foregoing reasons, the decree of the trial court is affirmed.

DENECKE, J., specially concurring.

I agree with the decision of the majority; however, I disagree with basing the decision upon the English doctrine of "customary rights." In my opinion the facts in this case cannot be fitted into the outlines of that ancient doctrine. 6 Powell, Real Property 362, § 934, n 5 (1968); 2 Thompson, Real Property, 463, § 369, n 50 (1961); Gray, The Rule Against Perpetuities, ch 17 (4th ed 1942); 15 Harv L Rev 329, 332 (1903).

In my opinion the doctrine of "customary rights" is useful but only as an analogy. I am further of the opinion that "custom," as distinguished from "customary rights," is an important ingredient in establishing the rights of the public to the use of the dry sands.

I base the public's right upon the following factors: (1) long usage by the public of the dry sands area, not necessarily on all the Oregon beaches, but wherever the public uses the beach; (2) a universal and long held belief by the public in the public's right to such use; (3) long and universal acquiescence by the upland owners in such public use; and (4) the extreme desirability to the public of the right to the use of the dry sands. When this combination exists, as it does here, I conclude that the public has the right to use the dry sands.

Admittedly, this is a new concept as applied to use of the dry sands of a beach; however, it is not new as applied to other public usages. In *Luscher v. Reynolds*, 153 Or 625, 56 P2d 1158 (1963), we held that regardless of who owns the bed of a lake, if it is capable of being boated, the public has the right to boat it.

"* * * There are hundreds of similar beautiful, small inland lakes in this state well adapted for recreational purposes, but which will never be used as highways of commerce in the ordinary acceptation of such terms. As stated in *Lamprey v. State*, 52 Minn. 181 (53 N. W. 1139, 38 Am. St. Rep. 541, 18 L. R. A. 670), quoted with approval in *Guilliams v. Beaver Lake Club*, supra, 'To hand over all these lakes to private ownership, under any old or narrow test of navigability, would be a great wrong upon the public for all time, the extent of which cannot, perhaps, be now even anticipated.' Regardless of the ownership of the bed, the public has the paramount right to the use of the waters of the lake for the purpose of transportation and commerce." 153 Or at 635-636.

In *Collins v. Gerhardt*, 237 Mich 38, 211 NW 116 (1926), the defendant was wading Pine River and

fishing. The plaintiff, who owned the land on both sides and the bed of Pine River, sued defendant for trespass. The court held for the defendant:

"From this it follows that the common-law doctrine, viz., that the right of fishing in navigable waters follows the ownership of the soil, does not prevail in this State. It is immaterial who owns the soil in our navigable rivers. The trust remains. From the beginning the title was impressed with this trust for the preservation of the public right of fishing and other public rights, which all citizens enjoyed in tidal waters under the common law. * * *." 237 Mich at 48.

These rights of the public in tidelands and in the beds of navigable streams have been called "jus publicum" and we have consistently and recently reaffirmed their existence. *Corvallis Sand & Gravel v. Land Board,* 250 Or 319, 335-337, 439 P2d 575 (1968); *Smith Tug & Barge v. Columbia-Pac. Towing,* 250 Or 612, 638, 443 P2d 205 (1968). The right of public use continues although title to the property passes into private ownership and nothing in the chain of title reserves or notifies anyone of this public right. *Winston Bros. Co. v. State Tax Com.,* 156 Or 505, 510-511, 62 P2d 7 (1937).

In a recent treatise on waters and water rights the authors state:

"The principle that the public has an interest in tidelands and banks of navigable waters and a right to use them for purposes for which there is a substantial public demand may be derived from the fact that the public won a right to passage over the shore for access to the sea for fishing when this was the area of substantial public demand. As time goes by, opportunities for much more extensive uses of these lands become available to the public. The assertion by the public of

a right to enjoy additional uses is met by the assertion that the public right is defined and limited by precedent based upon past uses and past demand. But such a limitation confuses the application of the principle under given circumstances with the principle itself.

"The law regarding the public use of property held in part for the benefit of the public must change as the public need changes. The words of Justice Cardozo, expressed in a different context nearly a half-century ago, are relevant today in our application of this law: 'We may not suffer it to petrify at the cost of its animating principle.' " 1 Clark (ed-in-chief), Waters and Water Rights, at 202 (1967).