**Robert L. MATCHA, et ux., Appellants,**

**v.**

**Honorable Jim MATTOX, Attorney General of Texas, on Behalf of the PEOPLE of Texas, Appellee.**

No. 14384.

Court of Appeals of Texas, Austin.

May 21, 1986.

Rehearing Denied June 18, 1986.

Karen A. Lerner, Houston, for appellants.

Jim Mattox, Atty. Gen., Ken Cross, Asst. Atty. Gen., Austin, for appellee.

Before SHANNON, C.J., and GAMMAGE and CARROLL, JJ.

SHANNON, Chief Justice.

Robert L. Matcha and Anne Morgan Matcha, husband and wife, seek to set aside a judgment of the district court of Travis County in an "open beach" suit. *See* Tex. Nat.Res.Code Ann. § 61.001 *et seq.* (1978 & Supp.1986). After a jury trial the district court directed a verdict and rendered judgment which, in general, prohibits the Matchas from interfering with the public's right of free access to and over the beach. This Court will affirm the judgment.

The attorney general pleaded that the Matchas own a lot in the Sea Isle subdivision on Galveston Island. Before August 18, 1983, a frame beach house stood on that lot. On that day a violent hurricane nearly destroyed the house—only portions of the foundation, pilings, floor, and walls of the structure remained. After the storm, the remains of the dwelling were located entirely seaward of the natural line of vegetation on the beach.

After the Matchas commenced reconstruction of the beach house, the attorney general posted notice on the structure that its repair might be in violation of law. Nonetheless, the Matchas continued the reconstruction and continued hauling in soil and setting out plants around the house, all such plants being seaward of the natural line of vegetation. The attorney general then obtained restraining and temporary injunctive orders from the district court prohibiting the continuation of repairs.

The attorney general pleaded that the public had acquired rights in the beach area where the Matchas' house, hauled-in soil and planted vegetation were situated. More specifically, the attorney general asserted that in the beach area between the line of mean low tide and the line of natural vegetation, the public had acquired a right of use or an easement by reason of prescription, dedication, or estoppel, or had retained a right of use and an easement because of continuous right in the public since time immemorial as recognized by law or custom. The attorney general claimed, accordingly, that whatever right the Matchas had to the area was subordinate to the right of lawful use of and access to the area by the general public.

The attorney general pleaded factually that the line of mean low tide and the vegetation line along the beaches of Galveston Island are affected by numerous

natural and artificial factors including climate, storm frequency and intensity, local and eustatic sea level conditions, sediment budget, and human activities. Along certain portions of the beach, these effects have been nominal and, as a result, the public beach area has been relatively stationary over the years. However, along other parts of the beach, these effects have been dramatic and, as a result, the public beach area has shifted laterally over relatively short periods of time.

The attorney general pleaded, among other things, that the Matchas' reconstruction of their house and their placement of earth and plants about the structure obstructed the common law right of the public to use the beach.

The underlying facts are undisputed. The Matchas own lot sixty in the Sea Isle subdivision on the West Beach of Galveston Island. In 1982, they built a beach house on the lot which was located immediately landward of the natural vegetation line as it existed in the summer of 1982. The powerful hurricane of August 1983 eroded the natural vegetation line landward about one hundred twenty-five to one hundred fifty feet from its prior position. The natural vegetation line was then landward of the Matchas' beach house. After the 1983 hurricane and before trial, the Matchas filled in their lot with earth and planted grass which they tended and cultivated.

In its judgment the district court concluded:

(1) that the public has acquired through prescription, dedication, and custom (a right retained by virtue of continuous right in the public since time immemorial) the free and unrestricted right of access to and use and easement over the beach in the vicinity of the Matchas' property, said beach being that area defined at common law and in Tex.Nat.Res. Code Ann. §§ 61.001–61.024 as the area bordering on the Gulf of Mexico between the line of mean low tide and the natural line of vegetation, this latter boundary being the extreme seaward boundary of natural vegetation which spreads continuously inland;

(2) that such public right of access, use, and easement follows the beach as the beach moves landward and seaward with the natural movements of the line of mean low tide and the natural line of vegetation;

(3) that the natural line of vegetation in the vicinity of the Matchas' property has most recently moved landward of the Matchas' property under the influence of Hurricane Alicia [the August 1983 hurricane] so that the Matchas' land and improvements thereon currently occupy a portion of the beach, as defined at common law and in Tex.Nat.Res. Code Ann. §§ 61.001–61.024;

(4) that the Matchas attempted to reconstruct a beach house and to place sand piles and plantings of vegetation seaward of the natural line of vegetation, and accordingly on the beach as defined at common law and in Tex.Nat.Res.Code Ann. §§ 61.001–61.024; and

(5) that such beach house, sand piles, and vegetation plantings constitute obstructions, barriers, restraints, and interferences with the free and unrestricted public right of access to and use of the beach where the Matchas' property is situated.

The judgment declared that the Matchas' property is servient to the public's right of access, use and easement because of the location of the Matchas' land on the public beach. The district court determined that the public had acquired such easement and right of access and use through (1) prescription; (2) dedication; and (3) custom (a right retained by virtue of continuous right in the public since time immemorial). The public's right of access, use and easement to the beach area follows the beach as it moves with the natural movements and fluctuations of the line of mean low tide and the natural line of vegetation.

The judgment ordered the Matchas to remove the beach house, sand piles, plantings, and any other obstructions or barrier to the public's use of the beach area. The

district court enjoined the Matchas from engaging in any activity, including the construction of any structures and the placement or nourishment of plants, which restrains or interferes with the right of the public, individually or collectively, to free and unrestricted access to and use of the beach area. Finally, the judgment declared that it was a judgment *in rem* against the land which it affects.

■ In lengthy briefs, the Matchas attack the district court's judgment and conclusions by twenty-six points of error. By numerous points, the Matchas claim that the district court erred in its preliminary conclusion that the public had acquired a free and unrestricted easement and right of access to and use of the beach in the vicinity of the Matchas' property. This Court will overrule the points of error and will affirm the judgment upon the basis that the public acquired a right of use or an easement in the vicinity of the Matchas' property by custom.

Custom is an ancient common law doctrine. "If A hath the ripa, or bank, of the port, the king may not grant a liberty to unlade upon the bank, or ripa, without his consent, unless custom had made the liberty thereof free to all, as in many places it is. . . ." *City of Galveston v. Menard*, 23 Tex. 349, 408 (1859) (Justice Roberts quoting Lord Hale).

*Mercer v. Denne*, 2 Ch. 538 (1905), involved the custom of fishermen in the parish of Wolmer of drying their fishing nets on the "beach ground." The suit arose when the owner of the beach ground attempted to prevent the fishermen from continuing this longstanding practice. Over the landowner's protestations that the custom made his land useless to him, the court held that the fishermen's net-drying practices had continued since "time immemorial," and had become a legal right which the landowner could not interrupt. The court recognized that, although the beach area had migrated somewhat over the years, "the custom began at the boundary between beach and sea." Hence, the court concluded, ". . . the area for drying would

always be adjacent to the boundary for the time being between the beach and the sea." 2 Chancery Division at 579.

Courts in several states have adopted the custom doctrine for determining public rights in beaches. *In State ex rel. Thornton v. Hay*, 254 Or. 584, 462 P.2d · 671 (1969), the Oregon Supreme Court first discussed dedication and prescription, and concluded that either of those doctrines would justify finding a public right to use privately-owned drybeach areas along the Oregon coast. "We believe, however, that there is a better legal basis for affirming the decree. The most cogent basis for the decision in this case is the English doctrine of custom." *Id.* at 676. Citing Blackstone, the court then enumerated the elements required to find that a custom exists: the public use must be ancient, peaceable, certain, obligatory, exercised without interruption, and not repugnant with other custom or law. *Id.* at 677. Since the public had freely used the dry-sand area along the Oregon coast for as long as there had been an institutionalized land tenure system in the state, the court concluded that the requirements had been met and the public custom had become a legal right. *Id.* See also *City of Daytona Beach v. Tona-Rama Inc.*, 294 So.2d 73 (Fla.1974); *State ex rel. Haman v. Fox*, 100 Idaho 140, 594 P.2d 1093 (1979); *Application of Ashford*, 50 Hawaii 314, 452, 440 P.2d 76 (1968).

In Texas, the common law, by force of statute, continues in effect until altered or repealed by the Legislature. Tex.Civ. Pract. & Rem.Code § 5.001 (1986). The statute makes the common law presumptively applicable unless good reason exists for not applying it. "We apply the common law to our conditions when our conditions are similar to those out of which the common law arose, but when the common law is not applicable, because of different conditions, we do not apply it." *Motl v. Boyd*, 116 Tex. 82, 286 S.W. 458, 470 (1926).

The doctrine of custom has been acknowledged and approved in at least two Texas opinions, although the appeals in those opinions were disposed of on other

grounds. In *City of Galveston v. Menard,* 23 Tex. 349 (1859), an opinion involving East Beach on Galveston Island, the Supreme Court specifically recognized that rights in the beach area may be acquired by custom. The court concluded, however, that because Galveston had only been settled for twenty years "no immemorial custom, in relation to rights on the coast, had matured into a common law...." 23 Tex. at 394.

The Corpus Christi Court of Civil Appeals in *Moody v. White,* 593 S.W.2d 372 (Tex.Civ.App.1979, no writ) affirmed a judgment declaring that the public had free and unrestricted right of ingress and egress to and the right of use and an easement to and over the beach at Mustang Island outside Port Aransas. The judgment was founded upon jury findings of prescription, dedication, and custom. The court stated "[W]e will not discuss the theory of custom other than to say that we recognize the doctrine and that the jury's findings in that regard are supported by sufficient evidence." *Id.* at 379.

No one doubts that proof exists from which the district court could conclude that the public acquired an easement over Galveston's West Beach by custom. As early as 1836, the public used the beach for travel. Dyer, The Early History of Texas, 59 (1916). That use has continued through the years. In *Seaway Company v. Attorney General of Texas,* 375 S.W.2d 923 (Tex.Civ.App.1964, writ ref'd n.r.e.) one reads recollections of venerable witnesses about a lifetime of driving, swimming and fishing along the Galveston beach. No one ever asked these persons if they had permission to use the beach and no one ever tried to stop them from that use. These persons just "figured" everyone had the right to use the beach.

By other points, the Matchas attack the district court's conclusion that the public's right of access, use, and easement follows the beach as it moves landward and seaward with the natural movements of the line of mean low tide and the natural line of vegetation. We overrule those points.

The law in this State has recognized migrating property rights in several contexts, most of which involve land near a body of water. The most analogous situation involves the transitory line between state and private property on the beachfront. It is established that the line of mean high tide marks the boundary between private beachfront property and the state's submerged property. Furthermore, this boundary line may move landward or seaward as the beach moves, and the property lines move accordingly. *State v. Balli,* 144 Tex. 195, 190 S.W.2d 71 (1944), *City of Corpus Christi v. Davis,* 622 S.W.2d 640 (Tex.App.1981, writ ref'd n.r.e.). [If the sea encroached and the upland owner lost his land, he had no redress; if alluvion formed adjoining the seashore, the latter receded with the tide line, and ... any new alluvion which formed above the tide line should become a part of the contiguous upland estate.]

Although an easement is generally a static real property concept, several Texas opinions have recognized that easements bordering on a body of water may be moved by the water's action. In *Moody v. White, supra,* the court recognized the migratory nature of the public beach easement:

> On one boundary the public beach is determined by the line of mean low tide, while the landward side is marked by the line of vegetation. Although these boundaries do tend to shift occasionally, they can be determined at any given point in time. The rule has been established that easements may shift from time to time, just as navigable rivers may change course by avulsion.
> 593 S.W.2d at 379.

The court in *Moody* referred to earlier riverbed avulsion opinions, and applied the rule from those opinions to the analogous beachfront erosion situation. Our courts have had more experience with riverfront easements, and the rule is well-established that erosion and accretion along a river can move property lines. In *Nonken v. Bexar County,* 221 S.W.2d 370 (Tex.Civ.App.1949,

writ ref'd n.r.e.), the court upheld a roadway easement over a creek even though the roadway had shifted some 35 feet over the years due to rains and washouts along the creek bottom.

Indeed, the theory of a migratory public easement is compatible with the doctrine of custom and the situations that often give rise to a custom. A public easement on a beach cannot have been established with reference to a set of static lines on the beach, since the beach itself, and hence the public use of it, surely fluctuated landward and seaward over time. The public easement, if it is to reflect the reality of the public's actual use of the beach, must migrate as did the customary use from which it arose. The law cannot freeze such an easement at one place any more than the law can freeze the beach itself. Custom is, after all, a reflection in law of a long-standing public practice, and therefore the legal result should mirror the factual reality as closely as possible.

■ Applying static real property concepts in this appeal would produce completely unworkable results if the beach continues to move. An easement fixed in place while the beach moves would result in the easement being either under water or left high and dry inland, detached from the shore. Such easement, meant to preserve the public right to use and enjoy the beach, would then cease functioning for that purpose. Because of these factors and because legal title shifts with the natural movements of the beach, *State v. Balli, supra; City of Corpus Christi v. Davis, supra,* this Court has concluded that the public easement also shifts with the natural movements of the beach.

■ By several points of error, the Matchas argue that two judgments in former litigation determined the location of the vegetation line near their lot and determined further that the vegetation line had not moved in two hundred years. Accordingly, the Matchas suggest those judgments bar relitigation of the location of the vegetation line. One such judgment is that of the district court in *Seaway v. Attorney General of Texas, supra.* The other judgment is a district court judgment from which no appeal was taken, which is referred to in the briefs as *John Hill, Attorney General of Texas v. West Beach Encroachment, et al.* The Matchas' ill-defined *res judicata* argument fails for at least two reasons.

First, the West Beach Encroachment judgment, which the Matchas claim conclusively adjudicated the location of the vegetation line, is not of record in this appeal. This judgment was not admitted into evidence, and the Matchas have not complained on appeal of its exclusion.

■ Second, the vegetation line is not a static line which can be conclusively located and adjudicated for all time. Under the doctrine of changed circumstances, unstable or changeable matters like a vegetation line cannot be finally adjudicated, but are always open to relitigation. *Franklin v. Rainey,* 556 S.W.2d 583 (Tex.Civ.App.1977, no writ). In *Franklin,* a suit between the same parties twenty years previously had resulted in a judgment determining that Franklin had diverted the natural water course and flooded Rainey's land. In a subsequent suit, involving the same issues, Rainey's successor asserted that the prior suit was *res judicata* and precluded the present suit. The Dallas Court of Civil Appeals disagreed:

> The judgment is res judicata only of present and not of future conditions. Here, during the more than twenty years that have elapsed since the judgment in the prior action, the ditch has been obstructed through neglect, and the levee has deteriorated so as not to operate effectively, thus changing again the flow of surface water and creating new conditions. Because the flow of the water has substantially changed since that judgment was rendered, we hold that there is a lack of subject matter identity for the prior judgment to be res judicata of this suit. Although there may be similarity of subject matter..., it does not follow that the prior judgment is res judicata to

the present case because of facts occurring in the intervening years which may alter the rights of the parties.

556 S.W.2d at 585.

By four points of error, the Matchas attack Tex.Nat.Res.Code § 61.013 as having been enacted into law by a bill which contained an unconstitutional caption and as authorizing a taking without just compensation. The points of error are overruled.

Section 61.013 provides for civil penalties varying from $50 to $1000 for obstructing the beach. An examination of the judgment shows that the district court imposed no civil penalties upon the Matchas. The district court further concluded in the judgment that the public acquired the complained-of-easement not by virtue of the Open Beaches Act, but instead through prescription, dedication, and custom. This Court has affirmed the district court's judgment declaring the easement upon the basis of custom.

The judgment is affirmed.